## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DIGITAL SYSTEMS GROUP, INC.,

                    Plaintiff,

    v.

THE FEDERAL EMERGENCY MANAGEMENT
AGENCY AND THE UNITED STATES
DEPARTMENT OF HOMELAND SECURITY,

                  Defendants.

Case: 1:25-cv-03634
Assigned To : Unassigned
Assign. Date : 10/10/2025
Description: TRO/PI (D-DECK)

Civil Action No. _____

UNDER SEAL

ORAL ARGUMENT REQUESTED

## PLAINTIFF DIGITAL SYSTEMS GROUP, INC'S
## MOTION FOR A PRELIMINARY INJUNCTION

Plaintiff Digital Systems Group, Inc. ("DSG" or "Plaintiff"), through undersigned counsel, respectfully moves the Court to enter an order enjoining Defendants, United States Department of Homeland Security ("DHS") and the Federal Emergency Management Agency ("FEMA," and together with DHS, the "Government"), from further misappropriating DSG's trade secrets and confidential information ("Confidential Information") in violation of the Trade Secrets Act, 18 U.S.C. § 1905. Specifically, DSG requests that the Court order that:

(1)    The Government is preliminarily enjoined from:

    a.    Accessing, publishing, copying, disseminating, or otherwise using DSG's Confidential Information in furtherance of the Financial Systems Modernization ("FSM") program, including in connection with the Financial Data Management Environment ("FDME");

    b.    Granting access to third parties to view DSG's Confidential Information, including permitting third parties to view or use DSG's Confidential Information that is within the Financial Data Management Environment ("FDME"); and

    c.    Continuing to pursue the FSM effort to the extent that effort involves the use of DSG's Confidential Information.

The grounds in support of DSG's Motion for a Preliminary Injunction are stated more fully in the accompanying Memorandum, and a proposed order is submitted herewith.

Dated: October 10, 2025                  Respectfully submitted,

                                         /s/ David L. Bodner
                                         David L. Bodner (D.C. Bar No. 90002027)
                                         Shane M. Hannon (*pro hac vice* forthcoming)
                                         BLANK ROME LLP
                                         1825 Eye Street NW
                                         Washington, D.C. 20006
                                         Phone: 202-420-2668
                                         Fax: 202-379-9140
                                         David.Bodner@blankrome.com
                                         Shane.Hannon@blankrome.com

*Of counsel:*
James T. Smith (*pro hac vice* forthcoming)
Thomas F. Brier (*pro hac vice* forthcoming)
BLANK ROME LLP
130 N. 18th
Philadelphia, PA 19103
Phone: 215-569-5453
Fax: 215-754-4198
Jim.Smith@blankrome.com
Thomas.Brier@blankrome.com

*Attorneys for Digital Systems Group, Inc*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of October 2025, I served a copy of the foregoing document on the Civil Division of the U.S. Attorney's Office for the District of Columbia by electronic mail at USADC.ServiceCivil.@usdoj.gov, and on the Civil Chief for the U.S. Attorney's Office for the District of Columbia by electronic mail at brian.hudak@usdoj.gov, as required under Standing Order No. 25-55, *In Re: Stay of Civil Proceedings Involving the United States in Light of Lapse of Appropriations* (October 1, 2025).

/s/ David L. Bodner
David L. Bodner

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DIGITAL SYSTEMS GROUP, INC.,

                   Plaintiff,

    v.

THE FEDERAL EMERGENCY MANAGEMENT
AGENCY AND THE UNITED STATES
DEPARTMENT OF HOMELAND SECURITY,

                   Defendants.

Civil Action No. _____

UNDER SEAL

ORAL ARGUMENT REQUESTED

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A
PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ................................................................................................1

II.     BACKGROUND .................................................................................................3

    A.      DSG, Development of WebIFMIS, and the Immense Value of WebIFMIS ............3

    B.      The Confidential Information and Trade Secrets that Power WebIFMIS.................5

    C.      FEMA's Repeated Determinations that it Cannot Disseminate WebIFMIS to
        Other Contractors ...............................................................................................7

    D.      DHS and FEMA's Efforts to Develop a New Financial Management System.........9

    E.      FEMA's Ongoing Improper Use and Dissemination of DSG's Confidential
        Information and Its Deeply Flawed Investigation and Post Hoc Excuses..............10

    F.      DSG's Legal Action at COFC Uncovers a Startling Reality: Full-Scale
        Copying of its Source Code and Database Schema ................................................12

III.    ARGUMENT .....................................................................................................14

    A.      Standard of Review. ...........................................................................................14

        i.      The Administrative Procedures Act .........................................................15

        ii.     The Trade Secrets Act ..............................................................................15

    B.      DSG's TSA Claim for Injunctive Relief is Reviewable Under the APA ...............17

    C.      DSG is Likely to Succeed on the Merits of its TSA Claim ...................................18

        i.      DSG Holds Valuable, Protectable Confidential Information in the
            WebIFMIS System ....................................................................................18

        ii.     FEMA Illegally Used and Disclosed DSG's Trade Secrets ........................21

    D.      Absent Injunctive Relief, DSG Will Suffer Imminent Reparable Harm.................24

    E.      The Balance of Equities and Public Interest Weigh Decidedly in DSG's Favor ....26

    F.      The Government Is Not Entitled to a Bond ...........................................................29

IV.     CONCLUSION..................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bennett v. Spear*,
520 U.S. 154 (1997)...................................................................................................20

*Blackhawk Indus. Prods. Grp. Unlimited, LLC v. U.S. Gen. Servs. Admin.*,
348 F. Supp. 2d 662 (E.D. Va 2004) ......................................................................32

*Bldg. Trades Unions v. Dep't of Def.*,
No. 25-cv-1070 (RC), 2025 WL 1423610 (D.D.C. May 16, 2025)........................35

*C.G.B. v. Wolf*,
464 F. Supp. 3d 174 (D.D.C. 2020) .........................................................................33

*CACI v. Field Servs., Inc. v. United States*,
12 Ct. Cl. 440 (1987) ...............................................................................................22

*CACI, Inc. - Fed. v. United States Navy*,
674 F. Supp. 3d 257 (E.D. Va. 2023) ...............................................21, 22, 29, 31

*Catalyst & Chem. Servs., Inc. v. Glob. Ground Support*,
350 F. Supp. 2d 1 (D.D.C. 2004), *aff'd sub nom. Cataltyst & Chem. Servs., Inc.
v. Glob. Ground Support*, 173 F. App'x 825 (Fed. Cir. 2006) ...............................26

*Chrysler Corp v. Brown*,
441 U.S. 281 (1979)..............................................................................21, 22, 23

*Conax Fla. Corp. v. United States*,
824 F.2d 1124 (D.C. Cir. 1987) ...............................................................................23

*Conax Florida Corp. v. United States*,
625 F. Supp. 1324 (D.D.C. 1985).....................................................19, 23, 31

*Council on Am.-Islamic Rels. v. Gaubatz*,
667 F. Supp. 2d 67 (D.D.C. 2009) ..........................................................................35

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
38 F.4th 1099 (D.C. Cir. 2022)................................................................................23

*Davis v. Pension Benefit Guar. Corp.*,
571 F.3d 1288 (D.C. Cir. 2009) ...............................................................................20

*Di Biase v. SPX Corp.*,
872 F.3d 224 (4th Cir. 2017) ...................................................................................32

*Dowty Decoto, Inc. v. Dep't of Navy,*
    883 F.2d 774 (9th Cir. 1989) ...................................................................21

*DSE, Inc. v. US,*
    169 F.3d 21 (D.C. Cir 1999) ....................................................................34

*Env't Tech. Inc. v. Env't Prot. Agency,*
    822 F. Supp. 1226 (E.D Va. 1993) ...........................................................21

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n,*
    636 F.2d 755 (D.C. Cir. 1980).................................................................34

*FMC Corp. v. Taiwan Tainan Giant Indus. Co.,*
    730 F.2d 61 (2d Cir. 1984).......................................................................19

*Harris Cnty. v. Kennedy,*
    —— F. Supp. 3d .....................................................................................35

*Home Funding Grp., LLC v. Myers,*
    No. 1:06-cv-1400, 2006 WL 6847953 (E.D. Va. Dec. 14, 2006) ..............30

*Jubilant DraxImage Inc. v. United States Int'l Trade Comm'n,*
    396 F. Supp. 3d 113 (D.D.C. 2019) ....................................................30, 34

*KSD, Inc. v. United States,*
    72 Fed. Cl. 236 (2006) ............................................................................14

*League of Women Voters of United States v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016)....................................................................34

*List Interactive, Ltd. v. Knights of Columbus*
    No. 17-CV-00210-RBJ, 2019 WL 2248547 (D. Colo. May 24, 2019) ............22, 29

*Megapulse, Inc. v. Lewis,*
    672 F.2d 959 (D.C. Cir. 1982).................................................................23

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Wertz,*
    298 F. Supp. 2d 27 (D.D.C. 2002)......................................................33, 34

*Mgmt. Sci. Am., Inc. v. Pierce,*
    598 F. Supp. 223 (N.D. Ga. 1984) ...........................................................21

*In re Microsoft Corp. Antitrust Litig.,*
    333 F.3d 517 (4th Cir. 2003) ...................................................................33

*Nat'l Parks and Conservation Assoc. v. Kleppe,*
    547 F.2d 673 (D.C. Cir. 1976)..................................................................21

*Nken v. Holder,*
   556 U.S. 418 (2009)...........................................................................................20

*Open Communities All. v. Carson,*
   286 F. Supp. 3d 148 (D.D.C. 2017) .................................................................34

*Qwest Commc'ns Int'l Inc. v. FCC,*
   229 F.3d 1172 (D.C. Cir. 2000)........................................................................21

*Ruckelshaus v. Monsanto Co.,*
   463 U.S. 1315 (1983).........................................................................................19

*Sherley v. Sebelius,*
   689 F.3d 776 (D.C. Cir. 2012)..........................................................................19

*Tootle v. Sec'y of Navy,*
   446 F.3d 167 (D.C. Cir. 2006)..........................................................................23

*Univ. of Tex. v. Camenisch,*
   451 U.S. 390 (1981)...........................................................................................20

*Widakuswara v. Lake,*
   779 F. Supp. 3d 10 (D.D.C. 2025) ....................................................................32

*Winter v. Nat. Res. Def. Council,*
   555 U.S. 7 (2008)........................................................................................20, 32

*Worthington Compressors, Inc. v. Costle,*
   662 F.2d 45 (D.C. Cir. 1981)............................................................................21

**Statutes**

5 U.S.C. § 702..........................................................................................................20

5 U.S.C. § 704..........................................................................................................20

5 U.S.C. § 706 (2)(A)...............................................................................................21

18 U.S.C.
   § 1839(3)(A) ...................................................................................................25
   § 1839 (3)(B)...................................................................................................22
   § 1905..........................................................................................12, 21, 22, 34

Administrative Procedures Act ...............................................................20, 22, 23, 34

CFO Act...................................................................................................................24

Contract Disputes Act ........................................................................................17, 18

FFMIA ....................................................................................................................................24

Trade Secrets Act........................................................................................................... *passim*

**Other Authorities**

FAR clause, 52.227-19(b)(2) .................................................................................................14

Federal Rule of Civil Procedure 65(c) ..........................................................................34, 35

Federal Rule of Evidence 408............................................................................................18

Plaintiff Digital Systems Group, Inc. ("DSG") respectfully submits this Memorandum in Support of its Motion for Preliminary Injunction against the United States Government, acting through the Federal Emergency Management Agency ("FEMA") and Department of Homeland Security ("DHS") (together, the "Government" or "Defendant").

## I.    INTRODUCTION

This case requires preliminary injunctive relief to stop the federal government from unlawfully providing a small business's most valuable asset—its proprietary financial management software—to its direct competitors for the express purpose of developing a competing financial system, in violation of the Trade Secrets Act.

For more than 30 years, DSG has been the sole-source provider to FEMA of its proprietary software application, the Web-Integrated Financial Management Information System ("WebIFMIS"), which has operated as FEMA's official accounting system of record since 1994. WebIFMIS controls, monitors, and facilitates the financial transactions handled by the agency— from disaster relief funds to daily payroll expenditures and everything in between—and is accessed by more than 1,500 government personnel on a daily basis. WebIFMIS also ensures compliance with the myriad statutes, regulations, and policies that govern the expenditure of taxpayer dollars, and provides FEMA's financial managers with a global view of more than 50 interconnected financial systems. Simply stated, WebIFMIS is the backbone of the entire agency; without WebIFMIS, FEMA could not function.

WebIFMIS is DSG's most valuable asset and a closely guarded trade secret. The core value of WebIFMIS lies in its confidential, proprietary software, which is powered by 35.87 miles of complex source code, countless creative design choices, database schema, and innumerable judgment calls that, taken together, enable FEMA to process and report on tens of millions of

granular financial transactions with accuracy, compliance, and auditability. Importantly, FEMA does not have any legal right to modify, disseminate, or utilize DSG's trade secrets. To quote FEMA itself, "no other entity possesses the rights to modify the proprietary software" that comprises WebIFMIS.

Just recently, however, DSG learned that FEMA is actively misappropriating DSG's trade secrets in order to build a new financial system to compete with and eventually replace WebIFMIS. This is not speculation or conjecture. Attached to the instant Motion are *thousands* of pages of evidence, obtained directly from the Government itself, showing that the source code embedded in FEMA's Financial Data Management Environment ("FDME")—which is a major component of FEMA's effort to create a new financial system—is *identical* to the source code embedded in WebIFMIS.[1] For example, within the material obtained from the Government, the term "OPS$IFMIS"—which is a unique, proprietary component embedded within WebIFMIS that processes certain financial transactions—appears more than *22,000 times* in the source code for the FDME. Worse still, numerous government contractors (and direct competitors of DSG) are copying and modifying DSG's trade secrets on a regular basis—even going so far as to claim ownership over certain proprietary WebIFMIS applications that are unquestionably owned by DSG.

The harm to DSG is ongoing, irreparable, and violative of the Trade Secrets Act ("TSA"). DSG stands to lose its sole-source status, its main customer, its competitive advantage in the marketplace, and its livelihood as a business. By the instant Motion, DSG asks this Court to do what DSG implored FEMA to do in the first instance: halt the wholesale dissemination and use of its confidential information and trade secrets.

---

[1] The Government has consented to DSG's sealed use of this information.

2

The balance of equities and the public interest weigh strongly in favor of preserving the *status quo ante*, protecting DSG's trade secrets, and pausing this deeply unlawful agency action. For these reasons and the reasons explained below, preliminary injunctive relief is urgently needed to prevent further misuse and dissemination of DSG's trade secrets during the pendency of this litigation.

## II.     BACKGROUND

In 1994, FEMA purchased from DSG a restricted rights license to use WebIFMIS as FEMA's official accounting system of record. FEMA has enjoyed the benefits of WebIFMIS, including its associated trade secrets, on an ongoing basis since that time. Now, after three decades of recognizing the confidential and proprietary nature of DSG's trade secrets, FEMA is brazenly copying and publishing DSG's trade secrets to DSG's competitors for the express purpose of developing a replacement for WebIFMIS. Moreover, FEMA misled DSG about its use of DSG's trade secrets, precipitating the need for this lawsuit.

### A.     DSG, Development of WebIFMIS, and the Immense Value of WebIFMIS

Founded in 1982 by its current President and CEO, Stanley Yavoroski, DSG is a small business based in Horsham, Pennsylvania, with 32 employees. (*See* **Exhibit 1**, Declaration of Stanley P. Yavoroski (hereinafter "Yavoroski Declaration"), ¶ 1.) Although DSG sells several software products, WebIFMIS is the company's crown jewel.

The development of WebIFMIS dates back to the late 1980s and early 1990s—a time when federal agencies' financial systems were fragmented, inconsistent, and dysfunctional, resulting in widespread inefficiencies and data processing issues. (*Id.* ¶ 7.) Drawing on his engineering background, Mr. Yavoroski saw an opportunity to create a comprehensive computer system that DSG could license to a government agency for use as its financial system of record. (*Id.* ¶¶ 3, 9.)

This was no easy task. The federal government is subject to a vast array of statutory, regulatory, and accounting policy requirements, and any financial system licensed to a government agency was required to first pass the Joint Financial Management Improvement Program ("JFMIP") certification process—a rigorous process chartered by the Department of Treasury ("Treasury") and the Office of Management and Budget ("OMB") that was designed to ensure that all financial systems licensed to the federal government met strict standards for compliance and functionality. (*Id.* ¶¶ 8, 13, Ex. A.)

At its own expense, DSG invested countless hours, millions of dollars, and all of its creative knowhow into creating WebIFMIS, a software system capable of processing massive volumes of data and delivering accurate, auditable results in compliance with detailed federal requirements. (*Id.* ¶¶ 9, 18.) Relying on a small team of computer software engineers—a rare skill in the late 1980s and early 1990s—DSG manually translated the complex federal accounting landscape into unique software code that, in its final form, spans 35.87 miles. (*Id.* ¶ 25.) The end result was WebIFMIS: a first-of-its-kind computer system, developed exclusively at private expense, that is capable of processing billions of dollars in financial transactions in accordance with government requirements. (*Id.* at ¶ 9.)

While DSG was developing WebIFMIS, FEMA was facing a severe accounting and funds control crisis. Its financial systems were non-standardized, non-compliant, and unauditable—a state of affairs that placed millions of dollars in congressionally appropriated funds at great risk. (*Id.* ¶ 14.) In 1994, under threat of losing its funding entirely, FEMA turned to the commercial marketplace for a solution. By that point, DSG's WebIFMIS had become one of only seven financial systems to achieve JFMIP certification. (*Id.* ¶ 16.) After conducting its own analysis of those seven options, FEMA chose WebIFMIS as the system best able to address the agency's needs.

(*Id.* ¶ 17.) Accordingly, in September 1994, FEMA and DSG entered into a contract granting FEMA a restrictive license to use WebIFMIS as its accounting system of record. WebIFMIS was installed at FEMA's offices shortly thereafter, in October 1994, and cured FEMA's non-compliance predicament within a few short months. (*Id.*) The installing of WebIFMIS resulted in the Disaster Relief Fund—the agency's largest and most important fund—being reconciled for the first time since FEMA's founding in 1979. (*Id.* ¶ 20.)

WebIFMIS has continuously served as FEMA's accounting system of record since 1994. (*Id.* ¶ 2.) During that time, WebIFMIS has received numerous awards for innovation and functional and technical features. It is the two-time recipient of the Service Award for Superior Mission Achievement (an award issued by DHS) and was one of five finalists for the Excellence.Gov Awards for Excellence in Innovation: Digital Government. (*Id.* ¶ 22.) Additionally, two FEMA Directors received recognition for their roles in helping DHS achieve its first unqualified audit opinion—a recognition due in large part to FEMA's reliance on WebIFMIS. (*Id.*) To this day, WebIFMIS continues to function as FEMA's accounting system of record.

### B.    The Confidential Information and Trade Secrets that Power WebIFMIS

One of the primary features of WebIFMIS is its ability to process vast amounts of information in accordance with federal accounting requirements without sacrificing data integrity. (*Id.* ¶¶ 28-29.) To do so, WebIFMIS utilizes a relational database, which stores data in interrelated tables designed by DSG. (*Id.* ¶ 30.) The complete system of these tables, and the relationships among them, is defined by a relational "database schema," which serves as a blueprint for building and understanding the WebIFMIS database. (*Id.*) To develop these proprietary applications, DSG (i) meticulously mapped out the full range of federal financial transactions and data types and then (ii) wrote source code for WebIFMIS that could process those transactions in compliance with

federal requirements. (*Id.* ¶ 31.) Additionally, to ensure comprehensive data integration, DSG designed WebIFMIS to interface seamlessly with other external systems. (*Id.* ¶ 27.)

The term WebIFMIS is defined as WebIFMIS, the Integrated Financial Management Information System ("IFMIS"), and the Payment and Reporting System ("PARS"), and is comprised of proprietary and trade secret components including, but not limited to: run-time, user interface processing, tables, views, indexes, triggers, communications processing, non-Oracle files, database definitions, metadata, schemas, sub-schemas, primary keys, foreign keys, views PL/SQL source code, SQL source code, source code of other computer languages, object code, rules, routines, scripts, designs, algorithms, processes, logic flow formulas, documentation, and related material. (*Id.* ¶ 23.) The proprietary, confidential, trade secret information in WebIFMIS (together, the "Confidential Information") is owned by DSG and was developed exclusively by DSG at an expense of approximately $81.1 million.[2]  (*Id.* ¶¶ 9, 26.)

Despite the significant technological advancement in this field, very few companies have passed the JFMIP certification test, which is a prerequisite to providing a financial management system to the federal government. (*Id.* ¶ 13.) Notably, DHS has twice attempted to develop such a system, but failed on both occasions.[3]

---

[2] This definition of "Confidential Information" expressly includes information that could be categorized as trade secrets and other information protected from disclosure by the Trade Secrets Act, 18 U.S.C. § 1905, including "processes, operations, style of work, or apparatus."

[3] *See Report to Committee on Homeland Security, House of Representatives – DHS Financial Management: Actions Needed to Improve Systems Modernization and Address Coast Guard Audit Issues*, UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE, at 47-48, *available at* https://www.gao.gov/assets/gao-23-105194.pdf (Feb. 2023) (hereinafter "GAO 2023 Report") ("In 2014, following its second unsuccessful modernization attempt, DHS resumed its financial systems modernization (FSM) efforts using a decentralized, component-level approach.")

### C.    FEMA's Repeated Determinations that it Cannot Disseminate WebIFMIS to Other Contractors

WebIFMIS provides immense monetary value to DSG. Accordingly, DSG has gone to great lengths to protect its Confidential Information from disclosure—whether to the Government itself, federal contractors, or private parties. (*Id.* ¶ 33.) More specifically, DSG implemented an extensive Configuration Management system to protect its Confidential Information from disclosure. (*Id.* ¶ 33.) This system is based on the same policies and procedures used by the Government for safeguarding classified material, and includes the following security measures:

- All source code for WebIFMIS is developed on DSG servers by DSG developers using individual accounts.

- Only DSG developers on the development servers can access the source code;

- Source code is turned into DSG's Configuration Management ("CM") staff, which applies it to the official source code libraries that are stored on DSG servers.

- Each modification to WebIFMIS is tracked with information such as date/time, the developer's name, the reason for the change, a System Requirements Tracking (SRT) number, and a CM tracking number.

- Only DSG CM personnel can modify the source code libraries.

- Only authorized developers on DSG's servers can access the source code libraries.

- Source code is not stored on any public servers (such as GitHub or other shared code systems).

- DSG maintains a firewall to deny public access to development servers and servers that contain source code libraries.

- The source code libraries are routinely backed up:
  - On-site to protected backup servers (daily).
  - Off-site via an encrypted disk (every 3 weeks).
  - Off-site in a bank safe-deposit box on an encrypted disk (every 6 weeks).

- Code releases are stored with SHA-256 (Secure Hash Algorithms) hash checksums that are used to ensure the integrity of the release files. These hashes are generated when DSG creates a release and are used to verify the release files.

- DSG creates a Build Plan for each release, which details the exact steps needed to deploy the release. The Build Plan contains the SHA-256 hash originally calculated by DSG's CM staff when the release was created so that it can be verified.

- DSG personnel attend Teams meetings planning for each release, including a Build Plan review meeting and a conference call during each release.

(*Id.* ¶ 33.)

As noted above, DSG licensed WebIFMIS to FEMA in 1994 with "restricted rights," meaning FEMA is expressly prohibited from disclosing the Confidential Information to any third parties or using that Confidential Information to create a new, competing system. (*Id.* ¶ 17.) Over the past 31 years, FEMA has repeatedly confirmed this understanding to DSG. For example, on August 19, 2020, FEMA issued a Task Order to DSG that included the following language:

> **6. Intellectual Property:** DSG has licensed its computer software, WebIFMIS, to FEMA with Restricted Rights as a perpetual site license. It may not be used, reproduced, or disclosed by FEMA except as provided in FAR clause, 52.227-19(b)(2).

DSG's status as a sole-source contractor is consistent with this understanding as well. Specifically, under federal law, the Government is authorized to issue contracts on a sole source basis if the product at issue was: (1) developed at the contractor's private expense and (2) contains proprietary and/or trade secret information that cannot be distributed by the Government to third parties.[4] Sole source contracts also require formal approval by several government persons, including legal counsel, an agency competition advocate, the warranted contracting officer, and a representative from the office or agency that uses the product.

Here, in 2009 and again in 2013, FEMA issued sole source contracts to DSG for WebIFMIS. (Yavoroski Decl. ¶ 19 & Ex. B.) In doing so, FEMA formally acknowledged that it

---

[4] *See KSD, Inc. v. United States*, 72 Fed. Cl. 236, 255 (2006) (explaining that sole-source contracts may be awarded where the product at issue was developed at the contractor's "private expense" and contains "proprietary" information belonging to the contractor that cannot be "distributed" by the government to third parties).

did not have the legal ability to disclose or modify the Confidential Information contained within

WebIFMIS:

> Digital System Group, Inc. holds the proprietary rights to the current
> version of IFMIS, the software used for FEMA's accounting system.
> Due to the proprietary nature of the software . . . no other entity
> possesses the knowledge of the IFMIS internal applications or the
> rights to modify the proprietary software . . . .

(*Id.*, Ex. B at 3.[5])

### D.    DHS and FEMA's Efforts to Develop a New Financial Management System

In 2014, DHS launched the Financial Systems Modernization ("FSM") initiative to

modernize and consolidate its financial systems across its agencies, including FEMA.[6] (*See Report*

*to Committee on Homeland Security, House of Representatives – DHS Financial Management:*

*Actions Needed to Improve Systems Modernization and Address Coast Guard Audit Issues*, UNITED

STATES    GOVERNMENT    ACCOUNTABILITY    OFFICE,    at    3,    *available    at*

https://www.gao.gov/assets/gao-23-105194.pdf (Feb. 2023) (hereinafter "GAO 2023 Report").)

The FSM initiative is classified by the Government as a "major acquisition program," with life

cycle cost estimates exceeding $300 million.  (*Id.* at 11.)  The goal of the FSM effort at FEMA is

to replace WebIFMIS with a new, fully integrated financial, acquisition, and asset management

system in accordance with DHS directives. (*Id.* at 4.)

---

[5] The original name of DSG's system was Integrated Financial Management System ("IFMIS"). The name was changed to WebIFMIS after the system was changed over to a web-based platform. The Confidential Information contained within the system, however, did not change.  For all intents and purposes, IFMIS and WebIFMIS are the same system.

[6] DHS has been pursuing financial systems modernization since at least 2003. The current initiative dates back to 2014, when DHS adopted a modernization strategy on a component-by-component basis. *See Report to Committee on Homeland Security, House of Representatives – DHS Financial Management: Actions Needed to Improve Systems Modernization and Address Coast Guard Audit Issues*, UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE, at 3, *available at* https://www.gao.gov/assets/gao-23-105194.pdf (Feb. 2023) (hereinafter "GAO 2023 Report").

DHS relies on a number of contractors to support the FSM initiative, who in turn manage two types of contracts: (1) software contracts, where FEMA can select from three vendors (Carahsoft, CGI Federal, and Mythics) pursuant to a $3 billion blanket purchase agreement; and (2) systems integration support contracts, where FEMA can select from seven vendors to handle various operational, training, and support services. (*Id.* at 17.)

### E.    FEMA's Ongoing, Improper Use and Dissemination of DSG's Confidential Information and Its Deeply Flawed Investigation and Post Hoc Excuses

In March 2024, DSG came across evidence showing that a FEMA contractor had published WebIFMIS source code to 79 participants, including DSG's competitors, in a chat room on Microsoft Teams. (Yavoroski Decl. ¶ 40.) DSG immediately notified FEMA of this egregious breach, and eventually convinced FEMA to conduct its own internal investigation into whether FEMA was in fact using DSG's Confidential Information in connection with the FSM effort. (Yavoroski Decl. ¶ 40.)

To assist with its investigation, FEMA asked DSG to provide any evidence in its possession supporting its claims of trade secret misappropriation. DSG agreed to do so. In June 2024, DSG sent a letter to FEMA outlining its findings. In that letter, DSG informed FEMA that it had recently uncovered a "change request" dated October 3, 2018, in which FEMA authorized the FSM team to "place an exact replica" of WebIFMIS—including DSG's Confidential Information—into the FDME to "develop and test scripts" for the new system. (*Id.* ¶ 19; *see also* Compl. ¶ 77.) DSG also provided emails from third-party contractors who were analyzing DSG's database schema, testing theories, and running queries to understand and replicate DSG's proprietary system. (Yavoroski Decl., Ex. C.) Moreover, DSG provided FEMA with a screenshot of the FDME showing that WebIFMIS's unique database schema was present in the FDME. (*Id.* ¶ 39.)

DSG's concerns were subsequently elevated to senior FEMA officials, who agreed to issue a report outlining the agency's findings. That report was issued two months later in the form of a memorandum dated August 21, 2024 (the "Memorandum"). (Yavoroski Decl. ¶ 40; *see also* Compl. at Ex. 1.) The Memorandum begins by acknowledging that WebIFMIS "is a proprietary commercial-off-the-shelf software package, which is owned and licensed by [DSG] to [FEMA and] has been licensed to FEMA with Restricted Rights as a perpetual site license since 1994." (Compl., Ex. 1 at 1.)

Despite conceding that FEMA had been using DSG's Confidential Information in connection with the FSM program, the Memorandum states that FEMA took "remedial" action by deleting two proprietary schemas owned by DSG from the FDME: (1)Database functions ("To-creal," "to_real," and "to_odate") and (2) the IFMIS schema. (*Id.* at 1-2; *see also* Yavoroski Decl. ¶ 42.) As discussed more fully below, this representation was not true.

Additionally, the Memorandum reached three arbitrary and capricious conclusions: (1) it mischaracterized the data migration as involving only FEMA-owned financial data, not DSG's Confidential Information; (2) it asserted that the relational database structure within WebIFMIS is a common industry standard and not proprietary, ignoring that DSG's concerns related to  its unique schema within WebIFMIS, not the general concept; and (3) it claimed that the 1994 licensing agreement between DSG and FEMA did not specify an exclusion for modernization activities—a conclusion that is squarely at odds with FEMA's recognition at the beginning of the Memorandum that FEMA only has a restricted rights license to use  WebIFMIS. (*See* Compl., Ex. 1 at 2.)

Despite finding that FEMA was using DSG's Confidential Information in connection with the FDME without authorization, the Memorandum nevertheless concludes that FEMA's actions

were lawful because, *inter alia*, DSG "has not provided any evidence for FEMA to validate their [sic] claim." (*Id.* at 2.) This, of course, was absurd, as DSG had previously sent FEMA, at FEMA's request, a listing of all evidence in its possession supporting its claims of illicit conduct. (*Id.* at 3-4.)

### F.    DSG's Legal Action at COFC Uncovers a Startling Reality: Full-Scale Copying of its Source Code and Database Schema

DSG commenced formal legal action shortly after receiving the Memorandum. Specifically, on October 3, 2024, DSG submitted a certified claim under the Contract Disputes Act, seeking monetary damages caused by, *inter alia*, FEMA's knowing and willful misappropriation of DSG's trade secrets. FEMA denied DSG's claim by letter dated January 10, 2025, which concluded that, with respect to DSG's trade secret claim, it was not unlawful for FEMA to place "exact replicas" of WebIFMIS into the FDME without DSG's authorization or consent. Having exhausted the Contract Disputes Act process, DSG promptly filed a complaint at the U.S. Court of Federal Claims on February 7, 2025, alleging causes of action for breach of contract, copyright infringement, and trade secret misappropriation under the Fifth Amendment taking, and seeking monetary damages.[7]

After filing suit in the Court of Federal Claims, DSG and the Department of Justice ("DOJ") engaged in several settlement discussions under Federal Rule of Evidence 408. (Yavoroski Decl. ¶ 45.) As part of those discussions, DOJ provided DSG with voluminous portions of the FDME source code, which DSG had requested in order to confirm whether FEMA did in fact "remove" DSG's Confidential Information from the FDME as it had represented in the Memorandum. (*Id.* at ¶ 46.) The results were shocking.

---

[7] These counts and allegations are not before this Court.

*First*, not only had FEMA failed to remove DSG's Confidential Information from the FDME, FEMA took the remarkable step of *reassigning the ownership* of DSG's proprietary functions to various third-party contractors working on the FSM initiative, including, for example, an employee of CACI, Inc.—one of DSG's direct competitors. (*Id.* at ¶ 50.f.) Upon information and belief, FEMA did so in order to prevent DSG from discovering that its trade secrets are still being used in the FDME.

*Second*, more than 90% of the FDME source code *is a bit-by-bit match* of the source code from WebIFMIS. (*Id.* at 50.a.) This indisputable evidence of unlawful trade secret disclosure is attached hereto in the form of 2,500 pages of documentation showing side-by-side comparisons of the source code in each system. (*Id.* at 50.a, Ex. D at DSG_000001-DSG_002621.)

*Third*, more than 228 individual accounts have been granted access to the FDME and, consequently, DSG's Confidential Information contained therein. A substantial number of these accounts belong to third-party contractors who have no right to access DSG's trade secrets. (*Id.* at 50.e., Ex. D at DSG_002484.)

Because equitable remedies are not available in the Court of Federal Claims, DSG requested permission from DOJ to use the foregoing evidence in the instant lawsuit. DOJ agreed to DSG's request so long as the information was filed under seal. Now armed with indisputable evidence of FEMA's unlawful conduct, DSG accordingly seeks immediate injunctive relief to prevent FEMA's brazen, ongoing unlawful disclosure of DSG's most valuable Confidential Information.

### III.    ARGUMENT

#### A.    Standard of Review.

While a preliminary injunction is an extraordinary remedy, courts routinely recognize the need for preliminary injunctive relief in trade secret cases because of the unique and special harm that can result from the misappropriation of those trade secrets. *See, e.g., FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984) ("A trade secret once lost is, of course, lost forever."); *Ruckelshaus v. Monsanto Co.*, 463 U.S. 1315, 1317 (1983) (refusing to grant a stay of district court's injunction because the disclosure of Monsanto's trade secrets to other companies and the public would cause Monsanto irreparable harm); *Conax Florida Corp. v. United States*, 625 F. Supp. 1324, 1326-27 (D.D.C. 1985) (finding that plaintiff showed it would "suffer irreparable harm" by losing its "sole source position"). Accordingly, a preliminary injunction serves as "a stopgap measure, generally limited as to time, and intended to maintain a status quo or 'to preserve the relative positions of the parties until a trial on the merits can be held.'" *Sherley v. Sebelius*, 689 F.3d 776, 781–82 (D.C. Cir. 2012) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).

To obtain preliminary injunctive relief, the moving party must satisfy four elements:

1. The movant is likely to succeed on the merits;

2. The movant is likely to suffer irreparable harm in the absence of preliminary relief;

3. The balance of equites weighs in the movant's favor; and

4. An injunction is in the public interest.

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). "The four factors have typically been evaluated on a 'sliding scale.'" *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009). Under this sliding scale, "[i]f the movant makes an unusually strong showing on one

of the factors, then it does not necessarily have to make as strong a showing on another factor." *Id.* at 1291–92. Additionally, where, as here, "the Government is the opposing party," the third and fourth factors merge into a single factor. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

### i.    *The Administrative Procedures Act*

The Administrative Procedures Act ("APA") provides that "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . is entitled to judicial review thereof." 5 U.S.C. § 702. A litigant may obtain judicial review for a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. An action is final if the agency has completed its decision-making process and its decision directly affects the parties. *Bennett v. Spear,* 520 U.S. 154, 177-78 (1997) (explaining that an action is final if the action (1) "mark[s] the consummation of the agency's decision[-]making process" and (2) determines obligations "from which legal consequences will flow"). A court is empowered to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A).

### ii.    *The Trade Secrets Act*

The Trade Secrets Act ("TSA") prohibits an agency from "publish[ing], divulg[ing], disclos[ing], or mak[ing] known in any manner . . . information concern[ing] or relat[ing] to the trade secrets . . . [to] any person except as provided by law[.]" 18 U.S.C. § 1905. The TSA protects against the unlawful disclosure of "trade secrets *and* other confidential matters." *Worthington Compressors, Inc. v. Costle*, 662 F.2d 45, 55 (D.C. Cir. 1981) (emphasis added); *see also Nat'l Parks and Conservation Assoc. v. Kleppe*, 547 F.2d 673, 687 n.50 (D.C. Cir. 1976) (noting that the TSA carries "a general prohibition against unauthorized disclosures of confidential commercial or financial information"); *Qwest Commc'ns Int'l Inc. v. FCC*, 229 F.3d 1172, 1176 (D.C. Cir. 2000) (same).

Accordingly, if the Government obtains confidential information from a third party and discloses that information without authorization, it violates the TSA. *See, e.g., CACI, Inc. - Fed. v. United States Navy*, 674 F. Supp. 3d 257, 273 (E.D. Va. 2023) (finding Navy likely violated TSA by disclosing contractor software's database schema); *Dowty Decoto, Inc. v. Dep't of Navy*, 883 F.2d 774, 775-76 (9th Cir. 1989) (finding that the Navy violated the TSA by disclosing the plaintiff-contractor's technical information); *see also Env't Tech. Inc. v. Env't Prot. Agency*, 822 F. Supp. 1226, 1228-29 (E.D Va. 1993) (any disclosure of information that "is of a kind that the provider would not customarily release to the public" violates the TSA).

Moreover, courts have interpreted the TSA to prohibit the unlawful "use" of another's trade secret. *See Mgmt. Sci. Am., Inc. v. Pierce*, 598 F. Supp. 223, 231 (N.D. Ga. 1984) (stating that, if the government "seeks or proposes to use or release [trade secret information], Plaintiff would clearly have a cause of action in this court under 5 U.S.C. § 702 and 18 U.S.C. § 1905.") (citing *Chrysler Corp v. Brown*, 441 U.S. 281 (1979)); *CACI v. Field Servs., Inc. v. United States*, 12 Ct. Cl. 440 (1987) (stating that a policy goal of § 1905 is that "certain commercially valuable or sensitive information may be preserved from unauthorized use").

To constitute a trade secret, the subject information must have "independent economic value, actual or potential, from not being generally known," and is valuable because third parties do not have access to it. 18 U.S.C. § 1839 (3)(B); *accord* 12 Pa. Stat. and Cons. Stat. Ann. § 5302; Restatement (Third), of Unfair Competition § 39 cmt. e (Am. L. Inst. 2023) ("A trade secret must be of sufficient value in the operation of a business or other enterprise to provide an actual or potential economic advantage over others who do not possess the information."). Such information can come in many forms, including in the form of database schema. *See CACI*, 674 F. Supp. 3d at 264 (finding database schema in computer software was a protectable trade secret); *Versata*

*Software, Inc. v. Internet Brands*, Inc., 902 F. Supp. 2d 841, 852 (E.D. Tex. 2012) (parties did not dispute that a "'database schema,' which describes how the data used in the software is arranged and details the relationships between different data elements," was a trade secret); *accord. List Interactive, Ltd. v. Knights of Columbus* No. 17-CV-00210-RBJ, 2019 WL 2248547, at \*5 (D. Colo. May 24, 2019) (parties did not dispute that a database schema could be a trade secret).

### B.    DSG's TSA Claim for Injunctive Relief is Reviewable Under the APA

This case is properly before this Court as a claim of unlawful agency action under the APA because, as discussed below, FEMA's disclosure of DSG's Confidential Information constitutes a violation of the TSA. 18 U.S.C. § 1905. It is well-settled that government action violative of the TSA is reviewable and "properly enjoinable" under the APA. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 317-18 (1979) (concluding that the government's "decision to disclose" Chrysler's confidential information, allegedly in violation of the TSA, was "reviewable agency action"); *see also Megapulse, Inc. v. Lewis*, 672 F.2d 959, 966-67 (D.C. Cir. 1982) (noting that the Supreme Court found that a TSA violation could supply a cause of action for an aggrieved party under the APA); *Conax Fla. Corp. v. United States*, 824 F.2d 1124, 1128 (D.C. Cir. 1987) (Navy decision to disclose contractor proprietary drawings would be unlawful under the Trade Secrets Act and "remediable under the APA"). In this case—as in *Chrysler*, *Megapulse,* and *Conax*—the "agency action" exists in the form of FEMA's August 2024 Memorandum, wherein it misrepresented its use of DSG's Confidential Information.

Importantly, this is not a contract claim under the Tucker Act. This Court applies a "longstanding test" to determine whether a claim is "at its essence a contract claim" falling within the exclusive jurisdiction of the U.S. Court of Federal Claims. *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (citing *Megapulse, Inc. v. Lewis*, 672 F.2d

959, 967-68 (D.C. Cir. 1982)). This test considers "both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Id.* at 968.

Here, the source of DSG's rights is the "government infringement of property rights and violation of the Trade Secrets Act." *Id.* at 969. The challenged Memorandum is not a contract and is not executed by an individual authorized to contract. The relief sought is purely injunctive and does not involve monetary damages or any other "prototypical contract remedy." *Crowley,* 38 F.4th at 1107 (citation omitted). And the injunctive relief is critical to DSG, as it preserves DSG's competitive position in the marketplace, prevents further irreparable harm from the dissemination of its Confidential Information, and preserves its position as a sole source contractor. *See Tootle v. Sec'y of Navy,* 446 F.3d 167, 174–75 (D.C. Cir. 2006) ("[M]ost importantly, the equitable relief sought by [DSG] has significant value."); *see also Conax Florida Corp. v. United States,* 625 F. Supp. 1324, 1326-27 (D.D.C. 1985) (finding "irreversible harm [from] the loss of its sole source position in the government market").

C.    **DSG is Likely to Succeed on the Merits of its TSA Claim**

i.    *DSG Holds Valuable, Protectable Confidential Information in the WebIFMIS System*

It is easy to describe a desired outcome; it is far more difficult to design and implement a computer system that reliably achieves it. DSG did just that by creating WebIFMIS—a financial management system that complies with the complex web of statutory, regulatory, and policy requirements governing federal financial management. (Yavoroski Decl. ¶¶ 9-13, 28.) WebIFMIS processes tens of millions of financial transactions each year with accuracy, produces fully auditable results, and curates data for users to make informed decisions. (*Id.* ¶¶ 29, 30.) At the heart of WebIFMIS is nearly 36 miles of source code implementing a proprietary database schema that uniquely organizes, stores, processes, and reports FEMA's financial data. (*Id.* ¶¶ 25, 30.) This

database schema, and the source code on which it relies, are DSG's most valuable assets and closely guarded trade secrets. (*Id.* ¶ 12.)

Federal financial management is governed by a dense network of authorities, including the Chief Financial Officer's Act of 1990, the Federal Financial Management Improvement Act of 1996, OMB Circulars A-11 and A-130, the Treasury Financial Manual, and Federal Financial Management System Requirements. (*Id.* ¶ 28.) These authorities demand systems that can collect, process, maintain, transmit, and report financial data; support budgeting; accumulate and report costs; and prepare auditable statements. (*Id.* ¶¶ 28-29.) DSG met this demand by investing significant time, expertise, and ingenuity to develop WebIFMIS—a system that seamlessly integrates massive volumes of data and delivers accurate, auditable results, in accordance with numerous federal authorities. (*Id.* ¶¶ 9, 30.)

Additional value lies in WebIFMIS's unique architecture, database schema, underlying logic, and source code, all of which are the product of DSG's proprietary know-how. (*Id.* ¶ 32.) For example, the system can instantly detect when a transaction attempts to draw more funds than FEMA has available and alerts appropriate personnel to the issue. While the alert itself may seem routine, it is the Confidential Information within WebIFMIS that allows the system to understand these nuanced federal accounting requirements and apply them, in real time, across FEMA's many accounts, systems, data points, and then present them in a user-friendly way. (*Id.* ¶¶ 27, 31.) This level of integration and intelligence is the result of DSG's unique design and expertise. Indeed, the federal government promulgated the JFMIP, which is a detailed certification for new financial systems to ensure each unique system can meet core minimum requirements. (*Id.* ¶ 8 & Ex. A.) Very few companies are able to achieve this certification, and DSG is one of only a handful of companies to have done so. (*Id.* ¶¶ 8, 16.)

19

Allowing competitors to access and modify DSG's Confidential Information destroys the competitive value of WebIFMIS. (*Id.* ¶ 52.) Before the FSM program began, FEMA relied on WebIFMIS on a sole-source basis for 30 years. (*Id.* ¶ 32.) But now, FEMA is using DSG's Confidential Information to build a new financial management system to directly compete with WebIFMIS—a development that is devastating to DSG's business. (*Id.* ¶¶ 53-54.) Recognizing this, DSG has taken extensive and reasonable measures to protect the secrecy of WebIFMIS, as required by law. *See* 18 U.S.C. § 1839(3)(A) (defining trade secret as having "independent economic value, actual or potential, from not being generally known"); *see also* 12 Pa. Stat. and Cons. Stat. Ann. § 5302 (trade secret derives value from not being generally known or readily ascertainable).

Access to the source code implemented in DSG's software is strictly limited to authorized DSG developers, who work on secure servers with all changes logged and only select personnel permitted to modify the code. (Yavoroski Decl. ¶ 33.) The source code is never stored on public servers, and robust firewalls prevent unauthorized access. (*Id.*) When DSG licensed WebIFMIS to FEMA, it did so with restrictive markings and retained database administration privileges for over two decades, ensuring FEMA could use the system but not access its proprietary underpinnings. In 2016, FEMA required DSG to provide FEMA with administrator privileges to WebIFMIS. As a result, the responsibility to track license usage fell on the Government, and DSG had to rely on its honesty. (Compl. ¶ 73.) Accordingly, it was FEMA's responsibility to protect DSG's Confidential Information, including WebIFMIS, and track the usage and dissemination of WebIFMIS. (*Id.*) Even after FEMA obtained administrator privileges to WebIFMIS, DSG's Confidential Information remained protected; disclosure to a licensee under conditions of confidentiality does not forfeit trade secret status. *See Catalyst & Chem. Servs., Inc. v. Glob. Ground Support*, 350 F.

Supp. 2d 1, 10–11 (D.D.C. 2004),*aff'd sub nom. Cataltyst & Chem. Servs., Inc. v. Glob. Ground Support*, 173 F. App'x 825 (Fed. Cir. 2006) ("[T]he owner of a trade secret may, without losing protection, disclose it to a licensee, an employee, or a stranger, if the disclosure is made in confidence, express or implied."). DSG licensed WebIFMIS to FEMA pursuant to conditions of confidentiality, which FEMA formally recognized on numerous occasions. (Yavoroski Decl. ¶ 19 & Ex. B.)

DSG's WebIFMIS is the result of significant expertise and investment, safeguarded by rigorous security protocols and legal protections. Its core value stems from a proprietary database structure and proprietary software logic, implemented via source code that enables the system to efficiently process vast amounts of data and deliver precise, auditable results—fully compliant with complex federal financial regulations. (*Id.* ¶¶ 27, 30, 32.) DSG's competitive edge depends on maintaining the confidentiality of its source code, which captures the system's unique organization and functionality. (*Id.* ¶ 52.) Protecting this source code is essential to preserving both the integrity and the value of WebIFMIS. (*Id.*) Accordingly, DSG's WebIFMIS system and Confidential Information contained within it are unquestionably protected by the TSA.

### ii.    *FEMA Illegally Used and Disclosed DSG's Trade Secrets*

FEMA unlawfully disclosed DSG's most valuable Confidential Information—its proprietary WebIFMIS system and source code—to a host of third-party contractors, all in pursuit of replacing DSG's system as part of the FSM effort. Despite DSG's repeated and urgent warnings, FEMA persisted in its unauthorized disclosures, culminating in a deeply flawed Memorandum designed to justify its ongoing misconduct. FEMA's actions are not only arbitrary and capricious, they also violate the TSA and the Government's own recognition of DSG's restricted rights in its software.

On March 29, 2024, during a meeting attended by DSG and other contractors, a FEMA contractor named Timothy Rainey published WebIFMIS source code to 79 participants, including competing contractors. (Yavoroski Decl. ¶ 40.) DSG immediately notified FEMA of this egregious breach. This striking disclosure caused DSG to undertake its own investigation into FEMA's wrongful conduct. (*Id.*)

DSG uncovered several instances of FEMA unlawfully disclosing its Confidential Information. DSG found that on October 3, 2018, the FSM team requested approval to "place an exact replica" of the current WebIFMIS, PARS, and ACCPAC databases into the FDME to "develop and test scripts" for the new financial system solution. (Compl. ¶ 78.) FEMA proceeded to copy DSG's entire WebIFMIS system—including its proprietary software and database schemas—and placed it in the FDME, where multiple FSM contractors were working to create a replacement system. (Yavoroski Decl. ¶ 50.) FEMA unlawfully gave third-party contractors unfettered access to DSG's Confidential Information, allowing them to harvest DSG's proprietary system to develop a competing system. (*Id.*) Despite FEMA's previous determinations that it did not have the license rights to share DSG's proprietary system with other contractors, FEMA elected to bulldoze a small business and its Confidential Information in pursuit of its goals. (*Id.* ¶ 19, & Ex. B.)

FEMA's disclosure was not an isolated incident. Further investigation revealed emails from February 2023 showing groups of contractors analyzing DSG's database schema, testing theories, and running queries to understand and digest DSG's proprietary system. DSG also received a screenshot of the FDME, depicting its unique source code, including terms such as "IFMIS" and "OPS$IFMIS"—terms unique to DSG and not generic accounting terminology. None of these

contractors should have had access to DSG's Confidential Information, and each time DSG was made aware of an improper disclosure, it brought it to the attention of FEMA.

DSG's repeated and urgent warnings precipitated a FEMA investigation. (*Id.* ¶ 40.) Rather than addressing the unlawful disclosures, FEMA attempted to justify its actions through a self-serving and arbitrary internal investigation. In June 2024, DSG provided FEMA with a list of intellectual property components that had been improperly taken and used in the FSM modernization effort. (Compl., Ex. 1 at 3-4.) However, instead of halting the unlawful disclosures, FEMA issued the Memorandum in an attempt to justify its unlawful conduct.

*First*, the Memorandum mischaracterizes the nature of FEMA's disclosure by claiming that FEMA only transferred financial data owned by FEMA, not proprietary software, to the FDME. (*Id.* at 2.) This is demonstrably false. FEMA's own documents show it copied "the existing Production data (tables and sequence) residing in the Web-IFMIS, PARS, and ACCPAC databases" and made "exact replica[s] of all three databases"—not just government financial records such as travel orders, pay stubs, or contracts. (Compl. ¶ 77.) Indeed, DSG uncovered that FEMA had copied thousands of pages of its exact source code. (Yavoroski Decl. ¶ 50 & Ex. D.)

*Second*, the Memorandum also asserts that the relational database structure is a common industry standard and not proprietary. (Compl., Ex. 1 at 2.) This is both factually and legally incorrect. Courts have recognized that specific database schemas can be protected intellectual property. *See, e.g., CACI*, F. Supp. 3d 257 at 264 (finding database schema in computer software was a protectable trade secret); *Versata Software, Inc. v. Internet Brands*, Inc., 902 F. Supp. 2d 841, 852 (E.D. Tex. 2012) (parties did not dispute that a "'database schema,' was a trade secret); *List Interactive, Ltd. v. Knights of Columbus* No. 17-CV-00210-RBJ, 2019 WL 2248547, at *5 (D. Colo. May 24, 2019) (parties did not dispute that a database schema could be a trade secret). DSG

is not seeking to protect the general concept of a database schema, but rather its unique database schema implemented via software that DSG developed to satisfy complex financial requirements. (Yavoroski Decl. ¶ 52.) FEMA made exact replicas of DSG's confidential software implementing its database schema, not a generic concept. (*Id.* ¶ 50.)

*Third*, the Memorandum further contends that DSG did not provide the WebIFMIS licensing agreement, which "did not specify an exclusion for modernization activities as claimed." (Compl., Ex. 1 at 2.) This is contradicted by the Memorandum itself, which acknowledges the Government's "Restricted Rights" in WebIFMIS under the 1994 contract. (*Id.* at 1.) It is further contradicted by previous Government determinations that its Restricted Rights did not authorize FEMA to disclose WebIFMIS proprietary software to contractors—especially competitors tasked with developing a replacement system. (Yavoroski Decl. ¶ 19 & Ex. B.)

FEMA's actions constitute a clear and unlawful disclosure of DSG's Confidential Information in violation of the TSA. The Government's attempt to justify its conduct through the deeply flawed Memorandum cannot withstand scrutiny.

### D.    Absent Injunctive Relief, DSG Will Suffer Imminent Reparable Harm

DSG's existence depends on the confidentiality and exclusivity of its proprietary WebIFMIS system. (*Id.* ¶ 52.) FEMA's unlawful disclosure of this system to DSG's competitors threatens immediate and irreparable harm to DSG. For 30-plus years, DSG's expertise and dedication have made it the sole provider of this critical system to FEMA and a sought-after subcontractor. Now, with its Confidential Information in the hands of direct competitors, DSG has already lost contract opportunities, and it is only a matter of time before competitors digest and replicate DSG's system, inflicting imminent and permanent destruction on DSG's business—a loss that cannot be remedied. (*Id.* ¶¶ 53, 54.)

Showing that irreparable injury is likely is the *sine qua non* for obtaining a preliminary injunction; it is what justifies the extraordinary remedy of granting relief before the parties have had the opportunity fully to develop the evidence and present their respective cases. *Jubilant DraxImage Inc. v. United States Int'l Trade Comm'n*, 396 F. Supp. 3d 113, 123–24 (D.D.C. 2019) (granting preliminary injunction because allowing disclosure of the brief with manufacturer's design choices would cause irreparable competitive harm.). "On its own, the disclosure of a trade secret "establishes immediate irreparable harm." *Home Funding Grp., LLC v. Myers*, No. 1:06-cv-1400, 2006 WL 6847953, at *2 (E.D. Va. Dec. 14, 2006).

Permitting FEMA to persist in disclosing DSG's Confidential Information will irreparably destroy DSG's competitive advantage and market position. (Yavoroski Decl. ¶ 52.) FEMA is providing DSG's competitors access to DSG's Confidential Information, unlocking DSG's hard work of digesting complex Treasury regulations and building a system that successfully implements its requirements. For more than 30 years, FEMA, in conjunction with DSG's competitors, have been unable to field a successful system that passes the JFMIP requirements and implements the maze of financial accounting requirements. DSG's unique capability led FEMA to repeatedly sole-source contracts to DSG, recognizing that FEMA could not share WebIFMIS with other contractors and that no other provider could deliver what DSG's system does. (*Id.* at ¶ 19, Ex. B.)

Allowing competitors unfettered access to DSG's Confidential Information during the pendency of this case would permanently destroy this advantage—a harm that is truly irreparable. *See Conax Fla. Corp. v. United States*, 625 F. Supp. 1324, 1327 (D.D.C. 1986) (government's disclosure of unique, proprietary data causes irreversible harm, including loss of sole-source position and competitive edge). This loss is not theoretical or remote; the very purpose of the FSM

program is to deploy a new financial management system. (*See* GAO 2023 Report at 1 (describing the purpose of FSM is to implement modern financial managements systems at three components including FEMA)). The longer that FEMA and its contractors have access to DSG's Confidential Information, the more harm is inflicted on DSG, as FEMA has shown no signs of ceasing its unlawful conduct. *CACI*, 674 F. Supp. 3d at 278 (finding that "it would make no sense to conclude that because the violation of the Trade Secrets Act has already occurred, Plaintiff cannot show 'irreparable harm'" because the harm occurs when plaintiff can no longer provide a "one-of-a-kind—product"). Additionally, while DSG was once a highly sought-after partner to team large business prime contractors, those opportunities have vanished because the same prime contractors now have direct access to DSG's system from FEMA. (Yavoroski Decl. ¶ 53.)

There is no adequate remedy at law for this harm. DSG's entire business is built around the WebIFMIS system; once its Confidential Information is lost, its core product and competitive edge are gone forever. (*Id.* ¶¶ 52, 54.) Even if monetary damages were available after years of litigation, they would be insufficient to restore DSG's market position or undo the disclosure of its most valuable asset and differentiator. (*Id.* ¶ 54.) The WebIFMIS system would become ubiquitous, and any damages would be cold comfort because DSG would have to start from scratch, with no guarantee of regaining its market position. (*Id.*) The damages are not only difficult to calculate, but by the time any relief is awarded, DSG will have ceased to exist as a viable enterprise. (*Id.* ¶ 54.)

### E.    The Balance of Equities and Public Interest Weigh Decidedly in DSG's Favor

The Government will not be harmed by returning to the *status quo ante*, which simply restores both parties to their positions before FEMA began improperly disclosing DSG's Confidential Information. "[C]ourts must balance the competing claims of injury and must

consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

DSG simply asks the Court to return the *status quo ante* while during the pendency of the case. Such relief is appropriate on a motion for a preliminary injunction. *See, e.g., Widakuswara v. Lake*, 779 F. Supp. 3d 10, 25 (D.D.C. 2025) ("A preliminary injunction is a stopgap measure, generally limited as to time, and intended to maintain a status quo or 'to preserve the relative positions of the parties until a trial on the merits can be held.") (citations and internal quotations omitted); *Di Biase v. SPX Corp.*, 872 F.3d 224, 231 (4th Cir. 2017) (the purpose of a preliminary injunction is to maintain the parties' prior positions and, as such, an injunction can "act to restore, rather than merely preserve, the status quo") (citations omitted); *Blackhawk Indus. Prods. Grp. Unlimited, LLC v. U.S. Gen. Servs. Admin.,* 348 F. Supp. 2d 662, 655 (E.D. Va 2004) (TSA case stating the purpose of a preliminary injunction is "'to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit.'") (quoting *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003)).

FEMA faces no meaningful harm if injunctive relief is granted. There is no harm to FEMA's mission in continuing to use the current, compliant system, that FEMA has successfully used for the last 30 years while the Court determines whether FEMA violated the TSA. (Yavoroski Decl. ¶ 50.) DSG does not seek to shut down FEMA's use of WebIFMIS, which is essential for FEMA's compliance with Treasury and OMB requirements. (*Id.*) DSG merely seeks to prevent FEMA from disclosing its Confidential Information to competitors developing a replacement system. (*Id.*) While a preliminary injunction may slow FEMA's efforts to design a new system, FEMA has failed to field a replacement financial management system of its own doing before. GAO 2023 Report at 47 (describing DHS's three failed attempts at a replacement financial management system).

27

Moreover, what little hardship FEMA faces from having to develop a system without the benefit of DSG's Confidential Information is a product of its own wrongful conduct. *See C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) ("It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice.") (quotation marks and citations omitted); *see also Merrill Lynch, Pierce, Fenner & Smith Inc. v. Wertz*, 298 F. Supp. 2d 27, 34 (D.D.C. 2002) ("[A] temporary restraining order preventing defendants from engaging in conduct they specifically agreed to avoid does not cause substantial injury to them").

The public interest strongly supports the issuance of a preliminary injunction pending a determination on the merits. Courts have consistently recognized a compelling public interest in protecting confidential business information and trade secrets—the very interests DSG seeks to safeguard here. *See, e.g., Jubilant DraxImage Inc*, 396 F. Supp. 3d at 126 ("There is, moreover, a strong public interest in protecting confidential business information and trade secrets.") (quotations and citations omitted); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Wertz*, 298 F. Supp. 2d 27, 34–35 (D.D.C. 2002) ("the Court believes the public interest is served by protecting confidential business information and trade secrets, and enforcing valid contractual provisions, to which parties have voluntarily entered.").

Furthermore, there is no public interest in allowing unlawful agency action to continue. *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). To the contrary, there is a substantial public interest in ensuring that governmental agencies comply with federal laws—including the APA—and the regulations that govern their conduct. *See Open Communities All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017). Congress has underscored the importance of protecting proprietary information by imposing criminal penalties for its unauthorized

disclosure. *See* 18 U.S.C. § 1905. DSG respectfully requests that FEMA be enjoined from sharing DSG's Confidential Information pending resolution of this matter.

### F.    The Government Is Not Entitled to a Bond

Pursuant to Federal Rule of Civil Procedure 65(c), "[t]he court may issue ... a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Rule has been read "to vest broad discretion in the district court to determine the appropriate amount of an injunction bond." *DSE, Inc. v. US,* 169 F.3d 21, 33 (D.C. Cir 1999); *see also Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n,* 636 F.2d 755, 759 (D.C. Cir. 1980) (discussing the widely recognized discretion that a district court granting temporary injunctive relief has with respect to the security requirement of Rule 65(c)).

This Court should not require DSG, a small business, to put up a bond. (*See* Yavoroski Decl, ¶ 1 ("DSG has 32 employees...")) The Government would not be substantially injured by stopping contractors from accessing DSG's Confidential Information. *See Council on Am.-Islamic Rels. v. Gaubatz,* 667 F. Supp. 2d 67, 81 (D.D.C. 2009) (finding no security necessary because defendants are not harmed by an order precluding them from further disclosing plaintiff's confidential information). Indeed, requiring a significant bond would impair DSG's ability to seek recourse in a court to vindicate alleged violations of its rights. *N. Am.'s Bldg. Trades Unions v. Dep't of Def.,* No. 25-cv-1070 (RC), 2025 WL 1423610, at *15 (D.D.C. May 16, 2025) ("Where the risk of financial harm is speculative at best and where a bond would have a chilling effect on access to justice, the balance of equities firmly supports waiving the bond."); *see also Harris Cnty. v. Kennedy,* —— F. Supp. 3d at ——, 2025 WL 1707665, at *18 (D.D.C. 2025) (declining to impose any bond)

## IV.    CONCLUSION

For all the foregoing reasons, DSG respectfully requests that this Court grant the instant

Motion and enter an Order in the form attached hereto.


Dated: October 10, 2025                                Respectfully submitted,

                                                        /s/ David L. Bodner
                                                        David L. Bodner (D.C. Bar No. 90002027)
                                                        Shane M. Hannon (*pro hac vice* forthcoming)
                                                        **BLANK ROME LLP**
                                                        1825 Eye Street NW
                                                        Washington, D.C. 20006
                                                        Phone: 202-420-2668
                                                        Fax: 202-379-9140
                                                        David.Bodner@blankrome.com
                                                        Shane.Hannon@blankrome.com

*Of counsel:*
James T. Smith (*pro hac vice* forthcoming)
Thomas F. Brier (*pro hac vice* forthcoming)
BLANK ROME LLP
130 N. 18th
Philadelphia, PA 19103
Phone: 215-569-5453
Fax: 215-754-4198
Jim.Smith@blankrome.com
Thomas.Brier@blankrome.com

*Counsel for Digital Systems Group, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of October 2025, I served a copy of the foregoing

document to be served on USADC.ServiceCivil@usdoj.gov, brian.hudak@usdoj.gov in

accordance with the Chief Judge of the U.S. District Court for the District of Columbia's

Standing Order 25-55, "In re: Stay of Civil Proceedings Involving the United States in Light of

Lapse of Appropriations" (dated October 1, 2025).


/s/ David L. Bodner
David L. Bodner
*Counsel for Plaintiff, Digital Systems Group, Inc.*