## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DIGITAL SYSTEMS GROUP, INC.,

            Plaintiff,                              Case No. 25-cv-3634 (JMC)

      v.

FEDERAL EMERGENCY MANAGEMENT
AGENCY, *et al.*,

            Defendants.

## MEMORANDUM OPINION

More than three decades ago, the Federal Emergency Management Agency purchased a license from Digital Systems Group to use the company's software—now called WebIFMIS—as the agency's accounting system. Now, the Government wants to replace that software with a new system. To transition to the new software, the Government needs to get all of its own data—payment records and the like—out of the WebIFMIS system and into the new one. But that task is not as simple as it might seem. The data needs to be reformatted so that the new system can make sense of it. To take a simple example, imagine that the old system stored phone numbers in a single unit (think one cell of a spreadsheet) but the new system separates them into two units, one for the area code and another for the rest of the number. The Government would need to break the phone numbers from the old system into two units so that they can be uploaded to the new system.[1]

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page. Citations to the exhibits in Digital Systems' Exhibit List, ECF 33, are to the PDF page number, rather than to any pagination printed on the specific document.

So that it can prepare for this migration, the Government created a digital staging environment. It put all of the data from WebIFMIS into this staging environment so that it could study it and determine what needed to be done to it for the transition. Digital Systems, however, says that the Government put more than just its own data into that staging environment. The company alleges that the Government also copied Digital Systems' proprietary code—the code for the WebIFMIS software. The problem, according to Digital Systems, is that the Government has no right to use the company's code in this manner. Digital Systems says this misappropriation violates the Trade Secrets Act and has asked the Court to enter a preliminary injunction to stop it.

Having considered the parties' arguments and heard two days of testimony, the Court concludes that Digital Systems is not entitled to a preliminary injunction. Even assuming the company is right that the Government is unlawfully using its code to facilitate the transition to the new accounting software, Digital Systems has failed to establish irreparable harm. All of its injuries are economic, and Digital Systems has not shown that those economic injuries cannot be redressed as they usually are—with an award of monetary damages. The motion for a preliminary injunction is therefore **DENIED**.

## I.      BACKGROUND

The Court heard testimony from three witnesses over the course of a two-day evidentiary hearing. The Court's account of the facts in this section represents its findings of fact based on that testimony as well as the documentary evidence submitted by both parties. Several of the factual disputes between the parties do not need to be resolved given the Court's resolution of the motion. The Court notes some of those unresolved factual issues in this section.

### A.  The WebIFMIS system.

In the 1980s, the Department of the Treasury, the General Accounting Office, and the Office of Management and Budget created a new "certification process" "designed to ensure that

financial systems used by the federal government met specific standards for compliance and functionality." ECF 3-2 at 4; ECF 19-4 at 20. Recognizing the demand for systems that could meet those requirements, Digital Systems Group "invested millions of dollars and hundreds of thousands of engineering hours to design and build" such a product. ECF 3-2 at 5.

The result of those efforts was IFMIS: "a comprehensive, auditable, and standards-compliant financial system capable of supporting a federal agency's entire funds control, accounting functions, disbursement, and reporting lifecycle while meeting the requirements of Treasury and" the Office of Management and Budget. ECF 3-2 at 5. The IFMIS system could "record all the financial events that happen[] inside a federal agency," create reports for Treasury, and "share[] information" across various external systems, all in a manner that complies with generally accepted accounting principles, auditing standards, federal laws, directives from various federal agencies, and more. Hr'g Tr. 13:25–14:14 (Nov. 13, 2025) [hereinafter 11/13 Hr'g Tr.]; ECF 3-2 at 5. To make IFMIS perform all of these tasks, Digital Systems wrote around 12 million lines of code. 11/13 Hr'g Tr. 29:9–11; *see also* ECF 3-2 at 9. Development cost the company "north of 60 million" dollars. 11/13 Hr'g Tr. 30:22–31:1. Digital Systems spent this money and effort developing IFMIS before it had a customer for the product. *See id.* at 30:18–31:9; *see also id.* at 40:25–41:1.

In the early 1990s, the company thought the product "was ready to go to market." 11/13 Hr'g Tr. 38:20–22. So Digital Systems sought the required certification from the federal government. *Id.* at 38:23–39:2. Without that certification, the company could not sell IFMIS to federal agencies. *Id.* at 39:3–6. In 1993, IFMIS was certified. *Id.* at 39:13–14.

The company's next step was to negotiate with the General Services Administration about "the terms and conditions" under which it would sell its products to federal agencies. 11/13 Hr'g

3

Tr. at 41:11–14. The result of those negotiations was a document called a "price list." *Id.* at 41:19–24. That document was shared by the General Services Administration with "potential ordering agenc[ies]," and it communicated to any ordering agencies that "want[ed] to get a license" what they were "getting." *Id.* at 42:1–5. The document included "prices" and "terms and conditions under which the order" would be placed by the agency. *Id.* at 42:7–11. One of those terms provided that "[t]itle to and ownership of the software and documentation shall remain with the contractor"—Digital Systems—"unless otherwise specified." ECF 33, Pl.'s Ex. 19 at 52. Another prohibited a purchasing agency from "provid[ing] or otherwise mak[ing] available the software or documentation, or any portion thereof, to any third party without the prior written approval of" Digital Systems. *Id.* at 53. These provisions were important to Digital Systems. *See* 11/13 Hr'g Tr. 44:21–42. "[I]t would be impossible" for the company to recover its "development costs" if it only made a single sale of IFMIS. *Id.* at 44:25–45:5. Instead, the company planned "to market the software to numerous government agencies." *Id.* at 45:6–10.

The first of those sales took place in 1994, when the Federal Emergency Management Agency (FEMA) decided to purchase a license to use IFMIS as its financial management software. *See* 11/13 Hr'g Tr. at 50:1–6, 51:12–23. That year, FEMA purchased a "perpetual" license to use the IFMIS software. *See* ECF 33, Pl.'s Ex. 20 at 106–07; *see also* ECF 1-2 at 2 (FEMA saying that IFMIS "has been licensed to FEMA with Restricted Rights as a perpetual site license since 1994").

Like the "price list" Digital Systems negotiated with the General Services Administration, its contract with FEMA included provisions addressing the ownership and use of Digital Systems' software. Of particular relevance, the contract incorporated Federal Acquisition Regulation 52.227-19. *See* ECF 33, Pl.'s Ex. 20 at 29. The version of that regulation in effect when the contract was executed provided that "restricted computer software delivered under [the] contract may not

4

be used, reproduced or disclosed by the Government except as provided" in a delineated list in the regulation or "otherwise in the contract." *See* FAR 52.227-19(c)(1) (1987). The uses approved by the regulation included, for instance, "us[ing] or cop[ying]" the software "for use in or with the computer or computers for which it was acquired," "reproduc[ing]" the software "for safekeeping (archives) or backup purposes," and "disclos[ing]" the software "to and reproduc[ing]" the software "for use by support service Contractors or their subcontractors, subject to the same restrictions set forth in [the] purchase order/contract." *Id.* at (c)(2)(i), (iii), (v).

Under the terms of this contract, FEMA has used IFMIS as its financial management software since 1994. *See* ECF 3-2 at 8, 20 (describing IFMIS' "key role" at FEMA for "more than three decades" and noting that IFMIS "remains FEMA's accounting system of record"). Over the years, Digital Systems says the "source code" in IFMIS has changed "[v]ery little." 11/13 Hr'g Tr. 200:6–9. The Government disputes that, but the Court need not resolve the dispute here.

One change that was made to IFMIS was its name. IFMIS became WebIFMIS in the early 2010s. *See* 11/13 Hr'g Tr. at 31:10–19. That change came about because FEMA was changing the "hardware"—the computer system—that IFMIS ran on. *Id.* at 31:21–32:2. Digital Systems transitioned IFMIS from FEMA's old computer system to its new one, and when it did so it changed the name of the software from IFMIS to WebIFMIS. *See id.* at 33:3–12. In making that transition, however, Digital Systems "did not rewrite the code" within WebIFMIS. *Id.* at 32:21. As Digital Systems' owner put it, FEMA was doing the equivalent of "upgrad[ing] from Windows 10 to Windows 11." *Id.* at 86:24–87:2. Carrying the analogy forward, IFMIS was akin to Microsoft Word, and "you can still run the same version of Word" on the new version of Windows. *Id.* "That's exactly what" Digital Systems did when it put WebIFMIS—new name, same product—

on FEMA's new "operating system." *Id.* at 86:13–18, 87:2. Under its new name, WebIFMIS continues to serve as FEMA's financial management software today. *See* ECF 3-2 at 20.

**B.  The Financial Data Management Environment.**

Although FEMA has continued to use WebIFMIS, it has for a while now wanted to make a change. The Department of Homeland Security initiated a "Financial Systems Modernization . . . program" in 2017 "to modernize financial solutions across the agency" (FEMA is housed within the Department of Homeland Security). ECF 13-1 at 19. The effort will "replace five legacy systems" at FEMA, one of which is WebIFMIS. *Id.*

FEMA is making this change to better "safeguard funds appropriated by Congress," to "improve disaster response capabilities," and to "ensur[e] compliance with all relevant laws and regulations." ECF 13-1 at 21. To that end, the modernization will close certain "capability gaps" in FEMA's current system. *Id.* Those include the use of "disparate systems" across various "components and offices" within the Department of Homeland Security, the existence of "significant internal control deficiencies, including issues with financial reporting, property management, and budgetary accounting," and the reliance on "outdated financial systems that are inefficient, difficult to maintain, and unable to meet modern operational demands." *Id.* at 21–22.

The new accounting system FEMA is switching to is provided by the software company SAP. *See* ECF 13-1 at 20, 29. To complete its transition to that new system, FEMA has to undertake "a process known as extract, transform, and load." ECF 13-1 at 28. That process is how FEMA will move its own "financial and procurement records"—FEMA owned data that is stored on WebIFMIS—from WebIFMIS to the new software. ECF 13 at 38; ECF 13-1 at 28–29.

The "extract, transform, and load" process is necessary "to make the existing or legacy data" that is currently stored in WebIFMIS "usable within the new system." ECF 13-1 at 28–29. "A simple export of data from WebIFMIS to the new SAP . . . system would not" be "successful."

6

*Id.* at 29. That's in part because data from "other systems"—ones that are "also being replaced" with the new SAP system—also "needs to … be transformed and loaded" into the SAP system. *Id.* What FEMA has to do, then, is "get . . . all [of this data] in one place so that [it] can do the complex data mapping" required to convert this data into a "unified data set" that can be loaded into the new system. Hr'g Tr. 17:15–24 (Nov. 19, 2025) [hereinafter 11/19 Hr'g Tr.]. To give one simple example: WebIFMIS might store a street address such that a single data field includes the number and street—"333 Constitution Ave."—while the SAP system might break that same address into two data entries—"333" and "Constitution Ave." To prepare FEMA's data about street addresses for transfer, the Government needs to take that "one data field of WebIFMIS" (containing the entire street address) and "break it apart" into two "data fields." *Id.* at 18:6–16 (explaining this example). This kind of data mapping is the "transformation stage" of the "extract, transform, and load" process. ECF 13-1 at 29.

To compile all of its data from its disparate systems into one place so that it can be "transformed" as required, FEMA built a "data staging environment." ECF 13-1 at 30. That environment is known as the "Financial Data Management Environment" (the FDME). *Id.* "The purpose of [the] FDME is to bring together FEMA's data from various systems" and "to prepare [that] data" for "migrat[ion]" to the new system. *Id.* at 30–31. Only "limited" "functions" can be performed in the FDME: "querying the data, joining the different data sets, and preparing the data and transformation rules to make [the] data usable within the new system." *Id.* at 31–32.

FEMA "stood up the FDME" in 2018. 11/19 Hr'g Tr. 21:16–19; ECF 33, Pl.'s Ex. 8 at 8–9 (the FEMA request to "[s]etup" FDME); ECF 3-2 at 14. Since then, FEMA has made considerable progress in transitioning to its new software and is now around 80% of the way

finished. *See* 11/19 Hr'g Tr. 48:16–23. The "go-live date for the new system" is October 1, 2026. *Id.* at 48:24–25.

## C. Digital Systems' complaints about improper use of its confidential information in the FDME.

The data modernization effort, and the FDME in particular, gave rise to the dispute at the heart of this case. In March 2024, Digital Systems became concerned that FEMA was misappropriating its trade secrets. That month, a FEMA contractor posted what Digital Systems calls "WebIFMIS source code" in a Microsoft Teams chat. ECF 3-2 at 14. Digital Systems then "submitted several written complaints to FEMA." *Id.* In one of those complaints, Digital Systems said that it had "learned . . . that [its intellectual property] comprising the WebIFMIS system was improperly taken and used in FEMA's modernization effort." ECF 1-2 at 4. In that same message, Digital Systems provided FEMA with a list of the WebIFMIS "components" that Digital Systems said "were copied, transferred, or otherwise utilized in the modernization effort." *Id.*

FEMA conducted an investigation in response to Digital Systems' complaints and issued its findings in an August 2024 memorandum written by Michael Nixon, the program manager at FEMA responsible for the modernization initiative. ECF 3-2 at 14–15. The Nixon Memorandum— the agency action being challenged in this case, *see* ECF 1 ¶ 146—concluded that 48 "of the approximately" 50 Digital Systems "components listed" in Digital Systems' complaint were "unfounded or not applicable to the complaint." ECF 1-2 at 2. FEMA did "find that two . . . database objects that may be perceived as" Digital Systems' intellectual property "have been utilized twice a year for the past four years for the data copy to FDME." *Id.* "Despite [its] disagreement with [Digital Systems'] complaints," FEMA said that it took "proactive steps to address potential concerns and prevent any future misunderstandings," including the "remov[al]" of the "database objects" that FEMA thought could be "perceived" as Digital Systems' intellectual

property. *Id.* at 2–3. The Nixon Memorandum reiterated in its conclusion, however, that it was FEMA's view that the "data migration" taking place in the FDME "does not involve the unauthorized use or replication of proprietary software or systems." *Id.*

Early the following year, Digital Systems sued FEMA in the Court of Federal Claims. *See* ECF 13-1 at 43. "This case," Digital Systems wrote in the first paragraph of its complaint, "concerns FEMA's years-long infringement and misappropriation of [Digital Systems'] proprietary financial management system[]"—WebIFMIS—"in furtherance of FEMA's Financial Systems Modernization . . . program." *Id.* The parties engaged in settlement discussions in that case, and as part of those discussions Digital Systems requested, and the Government provided, "source code from three sources": the "production version of WebIFMIS" (that is, the live version of WebIFMIS in use by FEMA as its accounting software), the "FDME as of May 31, 2024" (before the potentially problematic database objects were removed from the FDME, per the Nixon Memorandum), and the "current version of the FDME (as of August 2025)." ECF 3-2 at 16; *see* ECF 1-2 at 3 (Nixon Memorandum says database objects were removed in June 2024). "The purpose of obtaining source code from these three sources" for Digital Systems was determining "if any of [its] [c]onfidential [i]nformation from WebIFMIS was used: (1) in the FDME prior to June 2024, *i.e.*, prior to FEMA 'removing' [Digital Systems'] [c]onfidential [i]nformation; and (2) in the current FDME." ECF 3-2 at 16.

Using this code it got from the Government, Digital Systems "conducted a search comparison to see what (if any) source code from WebIFMIS was present in either the 2024 or 2025 version of the FDME." ECF 3-2 at 16. Digital Systems claims that it "found extensive amounts of WebIFMIS source code exactly matching the source code . . . in both the May 2024 FDME and the current FDME." *Id.* The company presented that code to this Court in the form of

a 2,500-page side-by-side comparison showing the 2025 version of the FDME next to the production version of WebIFMIS. *See* 11/13 Hr'g Tr. 107:7–18, 115:11–21. The Government, for its part, disputes whether all of the material presented in that comparison is actually source code and whether it is proprietary. The Court does not resolve this dispute here.

### D. This case.

The side-by-side comparison of WebIFMIS and the FDME led Digital Systems to come to this Court seeking an injunction. *See* 11/13 Hr'g Tr. 108:3–5. The company filed its complaint and a motion for a preliminary injunction on the same day. *See* ECF 1; ECF 3. Digital Systems brought a single claim under the Administrative Procedure Act, alleging that FEMA's decision to "us[e] [Digital Systems'] [c]onfidential [i]nformation to further its" modernization efforts is contrary to the Trade Secrets Act, 18 U.S.C. § 1905. ECF 1 ¶ 146. The complaint asked the Court to hold that decision unlawful and set it aside under 5 U.S.C. § 706(2). ECF 1 ¶ 135. In its motion for a preliminary injunction, Digital Systems asked the Court to enjoin the Department of Homeland Security and FEMA (both defendants here) "from further misappropriating" Digital Systems' "trade secrets and confidential information" in violation of the Trade Secrets Act. ECF 3 at 1.

In its response, the Government argued that this Court lacks jurisdiction over Digital Systems' claim because the Contract Disputes Act vests jurisdiction over claims of this kind exclusively in the Court of Federal Claims. *See* ECF 13 at 21–28. The Government's response also raised several factual issues. Its declarants testified that the only information in the FDME were "copies of FEMA owned financial and procurement records," not "application code or logic." ECF 13 at 38. The Government likewise claimed that much of the purportedly matching "code" in Digital Systems' line-by-line comparison was publicly available, and therefore not a trade secret. ECF 13 at 29–30. Finally, the Government argued that its use of WebIFMIS was authorized under its contracts with Digital Systems. *See* ECF 13 at 8–10, 31.

Because of the significant factual disputes between the parties about what was, in fact, on the FDME, the Court held a two-day evidentiary hearing. The Court heard from three witnesses. The Court also heard argument from the parties on the motion.

## II.    LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The party moving for a preliminary injunction must establish (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable harm without preliminary injunctive relief, (3) that the balance of equities tips in its favor, and (4) that an injunction serves the public interest. *See id.* at 20. If the moving party fails to carry its burden of showing irreparable injury, a court may deny a motion for a preliminary injunction without considering the other factors. *See, e.g.*, *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).

## III.    ANALYSIS

The Court considers first whether Digital Systems has established that this Court likely has jurisdiction over its claim. Although the Court concludes that Digital Systems cleared that hurdle, the Court nevertheless denies its request for a preliminary injunction. The company has failed to establish that it is suffering or is likely to suffer irreparable harm in the absence of a preliminary injunction. Because that failure is "grounds for refusing to issue a preliminary injunction," the Court's analysis stops there. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

### A.  The Court likely has jurisdiction over Digital Systems' claim.

As the Court explains below, Digital Systems has failed to establish that it is suffering or will suffer irreparable harm. That failure alone demands denial of its motion. *See Citizens for Resp.*

*& Ethics in Wash. v. U.S. Ctrs. for Disease Control & Prevention*, 786 F. Supp. 3d 83, 89 (D.D.C. 2025) ("A showing of irreparable harm is a must."). For that reason, the Court largely does not address Digital Systems' likelihood of success on the merits of its claim.

There is, however, one exception. To obtain a preliminary injunction, a party must show a "likelihood of success . . . not only [on their] substantive theories but also [on] establishment of jurisdiction." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). And, of course, "a federal court generally may not rule on the merits of a case without first determining that it has jurisdiction." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007). It seems possible, then, that the Court must address the likelihood of jurisdiction before considering any of the other preliminary injunction factors. On the other hand, "while a court 'may not rule on the merits of a case' without jurisdiction, it can consider certain threshold, non-merits grounds without needing to resolve its jurisdiction." *Chevron U.S.A. Inc. v. EPA*, 45 F.4th 380, 384 (D.C. Cir. 2022) (citing *Sinochem Int'l Co.*, 549 U.S. at 430–31). A failure to establish irreparable harm might be viewed as a "threshold, non-merits ground" that could be addressed "before examining jurisdictional questions." *Id.* The irreparable harm analysis can, however, at times be "intertwined with the merits" of a claim. *Brown v. Fed. Election Comm'n*, 386 F. Supp. 3d 16, 34 (D.D.C. 2019). Rather than resolve this seemingly unsettled question about the order of operations, and because the jurisdictional analysis does not require breaking any new ground, the Court will address the jurisdictional issue first.

"The United States and its agencies are generally immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). "Via the [Administrative Procedure Act], the Congress has provided a limited waiver of sovereign immunity." *Id.* That "waiver does not apply,

however, if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Id.* at 1106. The Government argues that the Contract Disputes Act is the "other statute" that "impliedly forbids" this Court from hearing Digital Systems' claim for injunctive relief. *See* ECF 13 at 21, 26–27. And the Government is right that, "where the claims [at issue] arise out of a contract governed by the Contract Disputes Act," that Act "limits adjudication of [the] dispute to the Claims Court." *Nat'l Star Route Mail Contractors Ass'n, Inc. v. U.S. Postal Serv.*, 223 F. Supp. 3d 14, 31 (D.D.C. 2016) (citing *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 76 (D.C. Cir. 1985)). The key question, then, is whether Digital Systems' "claims are properly construed as contract claims arising under" the Contract Disputes Act, such that they must be brought in the Court of Federal Claims. *Id.* at 33.

To answer that question, "the Court must inquire into the 'essence' of a particular claim" and decide "whether it 'presents a disguised contract action.'" *Am. Ass'n of Physics Teachers, Inc. v. Nat'l Science Found.*, No. 25-cv-1923, 2025 WL 2615054, at *9 (D.D.C. Sept. 10, 2025) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967–68 (D.C. Cir. 1982)). The "two-prong test" from *Megapulse, Inc. v. Lewis* guides that inquiry. *Id.* First, the Court considers "the source of the rights upon which the plaintiff bases its claims," and second, "the type of relief sought." *Megapulse*, 672 F.2d at 968.[2]

---

[2] In its opposition, the Government urged the Court not to apply "the *Megapulse* test," but instead to follow a Ninth Circuit decision that took a different approach. ECF 13 at 28. *Megapulse*, the Government argued, involved "the Tucker Act," not the Contract Disputes Act, and, the Government went on, the "jurisdictional breadth" of the Contract Disputes Act "is significantly greater than the Tucker Act." *Id.* The D.C. Circuit, however, has applied the *Megapulse* test to determine whether a claim falls within the scope of the Contract Disputes Act and therefore must be heard by the Court of Federal Claims. *See, e.g.*, *Commercial Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 4 (D.C. Cir. 1998). And it has done so since the 1992 amendments to the Act that the Government thinks expanded its scope. *See, e.g.*, *id.*; *A & S Council Oil Co. v. Lader*, 56 F.3d 234, 239–40 (D.C. Cir. 1995). Indeed, because of these cases the dissent in the Ninth Circuit case on which the Government relies insisted that the majority was "creat[ing] a circuit split with at least four circuits"—the D.C. Circuit included—"that expressly apply *Megapulse* in assessing whether the CDA impliedly forbids reliance on the APA." *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1038 (9th Cir. 2023) (Collins, J., dissenting). As other district courts in this circuit have, then, this Court applies *Megapulse* to determine whether a dispute is within the scope of the Contract Disputes Act. *See, e.g.*, *Nat'l Star Route*

Both prongs of that test plainly indicate that this claim is not at its "essence" a contract claim, and therefore is not within the exclusive jurisdiction of the Court of Federal Claims. Exactly like in *Megapulse* itself, Digital Systems' claim is not "based . . . on breach of contract, but on an alleged . . . violation of the Trade Secrets Act." *Megapulse*, 672 F.2d at 969. It is true that resolution of this case could require interpreting Digital Systems' contracts with the Government, given that the Government will not have violated the Trade Secrets Act if its action were "authorized by law." 18 U.S.C. § 1905. But "the mere existence of such contract-related issues" does not "convert this action to one based on the contract." *Megapulse*, 672 F.2d at 969.

So too is the relief sought here no different than the relief sought in *Megapulse*. There, the "plaintiff sought an order enjoining the dissemination of information in which it had an extra-contractual proprietary interest." *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985). Digital Systems is seeking the same: an injunction barring the Government "from further misappropriating" confidential information which Digital Systems claims qualifies as a protected trade secret under the Trade Secrets Act. ECF 3 at 1. The result here is therefore no different than the result in *Megapulse*. Here, like there, a government contractor is seeking an injunction under the Administrative Procedure Act, claiming that the government's disclosure of its proprietary information is contrary to the Trade Secrets Act. *See Megapulse*, 672 F.2d at 962–63, 966. Here, like there, the "action was properly brought under the APA, and injunctive relief, preliminary or permanent, is available in the district court." *Id.* at 971. Digital Systems has therefore established that this Court likely has jurisdiction over its claim.[3]

---

*Mail Ass'n, Inc.*, 223 F. Supp. 3d at 33; *Navab-Safavi v. Broadcasting Bd. of Governors*, 650 F. Supp. 2d 40, 67–68 (D.D.C. 2009).

[3] In its opposition, the Government also argued that the Court does not have jurisdiction because Digital Systems has an alternative "adequate remedy"—money damages in the Court of Federal Claims. ECF 13 at 22. As Digital Systems

**B. Digital Systems failed to establish irreparable harm.**

While Digital Systems has established a likelihood of jurisdiction, it has failed to show irreparable harm. That failure alone is sufficient "ground[] for refusing to issue a preliminary injunction." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. In conducting the "irreparable harm analysis," the Court will "assume[], without deciding, that [Digital Systems] has demonstrated a likelihood that the [Government's] conduct violates the law." *Id.* at 303. But even assuming that the Government is using and disclosing Digital Systems' trade secrets within the FDME, the company's injuries are economic, and "the general rule [is] that economic harm does not constitute irreparable injury." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009). Although it tries, Digital Systems cannot bring itself outside of that general rule.

To see why, consider first the injury Digital Systems cannot assert in this case. As Digital Systems concedes, the Government is free to stop using WebIFMIS and switch to a new accounting software. *See* Hr'g Tr. 53:10–15 (Dec. 1, 2025) [hereinafter 12/1 Hr'g Tr.]. Standing alone, then, Digital Systems cannot assert any injury, let alone an irreparable one, from the mere fact that WebIFMIS is being replaced.

Digital Systems might instead have shown that it was impossible to replace WebIFMIS without misappropriating Digital Systems' trade secrets. Were that the case, Digital Systems could perhaps claim that its injury is the replacement of WebIFMIS with a new software, given that it would be impossible to achieve that outcome but for the unlawful use of Digital Systems' trade secrets. And that would make this case look more like ones in which courts have held that plaintiffs

rightly pointed out in its reply, and as the Government conceded at the hearing on the motion, "whether another adequate remedy exists under § 704" of the Administrative Procedure Act "has no bearing on" whether "there is federal subject matter jurisdiction." *Crowley Gov't Servs., Inc.*, 38 F.4th at 1113 n.11; *see* Hr'g Tr. 67:21–68:2 (Dec. 1, 2025) (Government conceding this point). Because the Court is only addressing Digital Systems' likelihood of establishing jurisdiction, and not its likelihood of prevailing on the merits of any other aspect of this claim, the Court does not address the "adequate remedy" issue.

established irreparable harm by showing that the use of their trade secrets put them at a "competitive [dis]advantage" that is "hard to quantify through money damages." *Robert Half Int'l Inc. v. Billingham*, 315 F. Supp. 3d 419, 433–34 (D.D.C. 2018).

That possibility, though, is foreclosed by the testimony of Digital Systems' CEO, who explained that it was possible for the Government to transition its data from WebIFMIS to the new software without using any of Digital Systems' "source code." 11/13 Hr'g Tr. 127:6–15; *see also* 11/19 Hr'g Tr. 216:3–217:6 (describing "another way to do it"). The CEO went even further, too, acknowledging that had FEMA made the transition in one of these other, lawful ways, the company would be a "dead man walking at FEMA," with no possibility for future income once the transition was complete. 11/13 Hr'g Tr. 220:20–221:11. In other words, regardless of whether FEMA uses Digital Systems' trade secrets or not, the company is losing FEMA's business eventually.

Because this is how the evidence came in, Digital Systems is left with two possibilities. First, it could show that it is being irreparably harmed because the Government has expedited its transition to the new software by misappropriating Digital Systems' trade secrets. As Digital Systems' CEO put it, FEMA did the transition the "easier way" by using WebIFMIS code in the FDME, thereby speeding things along. 11/19 Hr'g Tr. 217:4–6; *see also* 11/13 Hr'g Tr. 127:8–19. If Digital Systems can show that irreparable harm results from the delta between how long it would have taken without using its trade secrets and how long it will take using them, it could be entitled to a preliminary injunction. A second possibility is for Digital Systems to show that the use and disclosure of its trade secrets in the FDME is in and of itself causing irreparable harm. The company has made both of these arguments, but neither suffices to establish irreparable harm.

The harms to Digital Systems from the Government's expedition of its transition are purely economic: lost time as the provider of FEMA's accounting software, during which Digital Systems

could have received service contracts or other payments from FEMA. "Recoverable monetary loss" of this kind "may constitute irreparable harm only where the loss threatens the very existence of the movant's business." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). The evidence Digital Systems put forward about how much it lost because FEMA transitioned more quickly by way of its misuse of Digital Systems' trade secrets, however, does not suggest that the threatened loss was nearly that grave.

Digital Systems' CEO explained what the alternative universe, in which its trade secrets were not used, would have looked like. One "option" for FEMA to make the transition without misappropriating Digital Systems' trade secrets was to "enter into a data cleansing contract with" Digital Systems and have Digital Systems prepare FEMA's data for migration to the new system. 11/13 Hr'g Tr. 127:21–128:2. And there was in fact a contract in place for Digital Systems to do exactly that. *Id.* at 128:3–10. That contract, however, was not ultimately funded by the agency. *Id.* The existence of that contract makes it possible to quantify how much money Digital Systems lost because FEMA took a shortcut: $4,463,308.38. ECF 33, Pl.'s Ex. 6 at 1; 11/13 Hr'g Tr. 112:9–114:14 (describing this contract). That's the amount Digital Systems would have been paid had FEMA opted to take this path for migrating its data. Digital Systems, however, has offered no evidence from which the Court could assess whether that amount of monetary loss "threatens the very existence" of its business, and has therefore failed to carry its burden on this front. *Wis. Gas Co.*, 758 F.2d at 674.

The other possibility Digital Systems' CEO laid out was that FEMA might have done the migration without using Digital Systems but by manually taking the "raw data" and "reanalyz[ing]" it to figure out what it means so that it could then be mapped onto the requirements of the new system. 11/13 Hr'g Tr. 127:11–15; 11/19 Hr'g Tr. 216:3–12 (describing how Digital

Systems conducted a similar process for the Library of Congress). That process is much more "labor intensive" and presumably would have taken longer. 11/13 Hr'g Tr. 127:11–15. While it was underway, perhaps Digital Systems would have received additional service contracts to maintain the WebIFMIS system. But Digital Systems did not put forward any evidence attempting to quantify that financial loss, so the Court has no reason to think it is so significant as to "threaten[]" Digital Systems' "very existence." *Wis. Gas Co.*, 758 F.2d at 674.

To be sure, the Court recognizes that Digital Systems cannot recover these monetary damages in this forum. *See* 5 U.S.C. § 702 (waiving sovereign immunity only for "relief other than money damages"). But this is not a case where Digital Systems' "alleged damages are unrecoverable." *Fredericks v. U.S. Dep't of the Interior*, No. 20-cv-2458, 2021 WL 2778575, at *18 (D.D.C. July 2, 2021) (K.B. Jackson, J.). To the contrary, Digital Systems has "already instituted an action . . . in the Court of Federal Claims[] in which [it] seek[s] a money judgment against the federal government on several grounds," including ones that substantially overlap with the claims in this case. *Id.* Digital Systems' complaint in the Claims Court, for instance, includes allegations about the "data cleansing services" that Digital Systems thought it would, but ultimately did not, perform for FEMA. ECF 13-1 at 62–64, 69. And the company seeks to recover damages that resulted from FEMA's alleged breached of contract by way of putting WebIFMIS source code in the FDME. *See id.* at 77–78. As part of those damages, Digital Systems seeks to recover not only what it would have received for the data cleansing contract but a whole lot more, asking for "breach of contract damages in an amount not less than $417,350,000." *Id.* at 81.

And "as best as this Court can discern, at least preliminarily, this Court's disposition of the instant matter would likewise resolve the damages claims [Digital Systems has] brought in [its] Court of Federal Claims lawsuit." *Fredericks*, 2021 WL 2778575, at *20. If the Court determines

that Digital Systems prevails on its APA claim, it will have necessarily also determined that its contracts with FEMA did not authorize this use of its trade secrets. *See* 18 U.S.C. § 1905 (prohibiting misappropriation unless "authorized by law"). Because Digital Systems is "likely to prevail in [its] Court of Federal Claims action if this Court ultimately rules in [its] favor," there is a "potential avenue . . . for [Digital Systems] to obtain relief at the conclusion of the instant case if this Court enters judgment in" its favor. *Fredericks*, 2021 WL 2778575, at *19; *see also Wis. Gas Co*, 758 F.2d at 675 (concluding that petitioners failed to show irreparable injury where there were "several possible means by which [they] could recover" alleged monetary damages). For all of these reasons, Digital Systems has not demonstrated that it is suffering or will suffer irreparable harm because the Government is transitioning more quickly to the new software by way of its misuse of Digital Systems' trade secrets.

Now turn to the second possibility—that the use and disclosure of Digital Systems' trade secrets is in and of itself irreparable. Digital Systems leans hard on this argument, citing a case from the Eastern District of Virginia for the proposition that "the disclosure of a trade secret 'establishes immediate irreparable harm.'" ECF 3 at 34 (quoting *Home Funding Grp., LLC v. Myers*, No. 1:06-cv-1400, 2006 WL 6847953, at *2 (E.D. Va. Dec. 14, 2006)). The principle underlying that decision is that "the disclosure of confidential information can constitute an irreparable harm because such information, once disclosed, loses its confidential nature." *Hospitality Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 200 (D.D.C. 2010); *see also Home Funding Grp., LLC*, 2006 WL 6847953, at *2 ("[A] trade secret, once lost is, of course, lost forever.").

That principle is sound, but it does not lead to the per se rule Digital Systems wishes it did. Instead, in application it means that "[c]ourts find dissemination of information to be an irreparable

19

injury where, for example, highly sensitive information will be made *public*, or ends up in the hands of someone with no obligation to keep it confidential." *Univ. of Cal. Student Ass'n v. Carter*, 766 F. Supp. 3d 114, 121 (D.D.C. 2025). By contrast, "courts have declined to find irreparable injury where the challenged disclosure is not 'public,' but involves individuals obligated to keep it confidential." *Id.*; *see also Clevinger v. Advoc. Holdings, Inc.*, No. 23-cv-1159, 2023 WL 4560839, at *7 (D.D.C. July 15, 2025) ("In general, courts find irreparable harm when evidence indicates that proprietary information or trade secrets are at risk of being appropriated or revealed.").

In *Ashland Oil, Inc. v. FTC*, for instance, an oil company sought a preliminary injunction to bar the Federal Trade Commission from disclosing its "highly sensitive competitive data" to a member of Congress. 409 F. Supp. 297, 299–300 (D.D.C. 1976). The company complained that the Congressman and his committee had mishandled trade secrets in the past and that they feared the same would happen here, thereby disclosing their confidential information to competitors who could exploit it. *See id.* at 308 & n.14. The court denied the request for a preliminary injunction, holding that there was no reason to believe that the Congressman or committee would disclose the company's trade secrets to its competitors, and that allowing the legislators to see the trade secrets did not in and of itself constitute irreparable harm. *See id.* at 308–09.

These guideposts are instructive here. Only 15 people have access to the FDME. Two of those people work for Digital Systems, two work for FEMA, and the remaining eleven are contractors at other companies (including companies with which Digital Systems competes). *See* 11/19 Hr'g Tr. 128:22–129:4. Digital Systems obviously is not harmed by its own employees having access to its code. Nor is it harmed by FEMA employees seeing the code in the FDME, given that FEMA already had access to "the source code for WebIFMIS." 11/13 Hr'g Tr. 102:5–

7. That leaves only the contractors. Crucially, all of them are "obligated to keep [Digital Systems' information] confidential." *Univ. of Cal. Student Ass'n*, 766 F. Supp. 3d at 121. That's because they all signed non-disclosure agreements. *See* ECF 13 at 43. These competitors cannot then, contrary to Digital Systems' fear, "study and reuse [Digital Systems'] work product." ECF 3-2 at 20. Instead, they can use it in the FDME but may not disclose it anywhere else. That suggests Digital Systems is not being irreparably harmed by the disclosure of its trade secrets in the FDME.[4]

Nor is there any evidence that Digital Systems' trade secrets are being used in the FDME to create a competing product. What all of the evidence suggests is—at worst—the Government is misusing Digital Systems' trade secrets for the purpose of preparing FEMA's own data for migration into the new software the Government already purchased. That new SAP software, however, "has no use for [Digital Systems'] source code." 11/19 Hr'g Tr. 78:25. Indeed, it would make little sense to attempt to modify the new SAP software by copying or adapting WebIFMIS source code. One of the "guiding principles" underlying the Government's modernization effort is known as "clean core," which "means keeping your . . . system as close as possible to its standard, vendor-provided state." ECF 13-1 at 20–21. In other words, the Government's aim is to use the

---

[4] Had Digital Systems given the Court reason to think that the contractors or Government were disregarding the nondisclosure agreements or otherwise acting in bad faith, perhaps it would not be sufficient that the contractors are formally obligated to maintain the secrecy of what they see in the FDME. But Digital Systems' efforts to impute that sort of bad faith have not convinced the Court. For instance, the company makes a lot of noise about the Government reassigning the ownership of certain database objects in the FDME from a WebIFMIS account to the accounts of contractors. *See, e.g.*, ECF 3 at 22. One of the Government's witnesses, however, explained—and the Court found this testimony credible—that it took that step so that if any of the data in the FDME leaked, there would be nothing in it that could "identify it as [related to the] Department of Homeland Security or Federal Emergency Management Agency." 11/19 Hr'g Tr. 19:15–19. Having "WebIFMIS" listed as a "username . . . associated" with the data could reveal that it is FEMA data. *Id.* at 19:20–23. The Court similarly finds that the contractor who posted WebIFMIS code in the Microsoft Teams chat was not engaged in anything untoward that raises concerns about the contractors' compliance with their nondisclosure agreements. That Teams chat was convened to "troubleshoot" a recurring problem in the WebIFMIS system. 11/19 Hr'g Tr. 41:1–42:9. That contractors were looking at WebIFMIS code to resolve a technical problem in WebIFMIS does not suggest anything is afoot with their use of the code in the FDME. Indeed, allowing contractors to use WebIFMIS code for this purpose seems likely to have been within the Government's rights. *See* FAR 52.227-19(c)(2)(v) (allowing for "dislos[ure] to and reproduc[tion]" by "support service Contractors"); 12/1 Hr'g Tr. 21:2–16 (Digital Systems arguing that FAR 52.227-19(c)(2)(v) authorizes use of its software by contractors when done for purpose of "support service specifically to WebIFMIS").

SAP software exactly as it was purchased, not to copy the source code from WebIFMIS into the SAP software or modify the SAP software after studying the WebIFMIS code.

This is therefore a case where the "misappropriator seeks only to use th[e] secrets—without further dissemination or irreparable impairment of value." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). "[A]n award of damages" can "provide a complete remedy for such an injury." *Id.* at 118–19; *see, e.g.*, *Econ. Rsch. Servs., Inc. v. Resol. Econ., LLC*, 140 F. Supp. 3d 47, 52–53 (D.D.C. 2015) (business seeking preliminary injunction against company allegedly using "its confidential and proprietary information" failed to establish irreparable harm where its "true interest" was preventing the company from "siphoning its future profits"). Because FEMA's use of Digital Systems' code in the FDME—assuming it is unlawful— is causing only the kind of "economic injur[y]" that is "compensable," Digital Systems has failed to establish irreparable harm. *Econ Rsch. Servs., Inc.*, 140 F. Supp. 3d at 53.

*    *    *

The motion for a preliminary injunction is denied. A separate order accompanies this memorandum opinion.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: December 15, 2025