UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DIGITAL SYSTEMS GROUP, INC.,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL EMERGENCY MANAGEMENT AGENCY, *et al.*,<br><br>Defendants. | Case No. 25-cv-3634 (JMC) |

# MEMORANDUM OPINION

Digital Systems Group sold the Federal Emergency Management Agency (FEMA) a license to use the company's accounting software in the 1990s. After more than two decades, FEMA is modernizing its accounting practices and switching to different software. That switch has led to a bitter dispute about whether FEMA is misappropriating Digital Systems' trade secrets as part of its modernization effort. Because of that dispute, Digital Systems filed this lawsuit seeking to enjoin FEMA's alleged misappropriation. To that end, the company sought a preliminary injunction. After a two-day evidentiary hearing, the Court denied the company's motion for that extraordinary relief. *See Digit. Sys. Grp., Inc. v. FEMA*, No. 25-cv-3634, 2025 WL 3876559 (D.D.C. Dec. 15, 2025). Based on the Court's factual findings, it concluded that Digital Systems "failed to establish irreparable harm. " *Id.* at *1. Digital Systems has now asked the Court to reconsider that ruling. The Court denies that request because Digital Systems has not shown that

reconsideration is justified. The Court likewise denies the Government's pending motion to dismiss and Digital Systems' pending motion to complete the administrative record.[1]

## I. BACKGROUND

Because this is the Court's second memorandum opinion in this case, it sketches the background of the dispute only briefly. *See Digit. Sys. Grp.*, 2025 WL 3876559, at *2–5 (describing background in preliminary injunction ruling). It also opts for that path because different standards apply to the different motions currently before the Court. The motion for reconsideration of the Court's ruling on the preliminary injunction allows for consideration of the factual record as developed during those proceedings and the Court's factual findings in denying the preliminary injunction. In resolving the Rule 12(b)(6) motion, on the other hand, the Court must limit its review to the complaint and "accept [its] factual allegations . . . as true." *Sierra Club v. Jackson*, 648 F.3d 848, 855 (D.C. Cir. 2011). To avoid confusion, the Court therefore outlines the facts here only at a high level. Below, the Court addresses the facts relevant to each motion as they are properly viewed under the respective standards of review.

* * *

In 1994, FEMA purchased a license from Digital Systems Group to use the company's "financial management" software—WebIFMIS. ECF 1 ¶ 38. The agency has continued to use Digital Systems' software since then. *See id.* ¶ 3. But in the 2010s, "the Department of Homeland Security launched the Financial Systems Modernization initiative to modernize and consolidate its financial systems across its components, including FEMA." *Id.* ¶ 49. As part of that initiative, FEMA plans to "replac[e] WebIFMIS with a new core financial and procurement system." *Id.*

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

¶ 50. FEMA selected an SAP product as its new system and has hired contractors to help it implement that new software. *See id.* ¶ 56.

Eventually, Digital Systems grew concerned that "FEMA was using" Digital Systems' confidential information as part of its modernization effort. ECF 1 ¶¶ 67–68. In particular, the company thought that the agency had placed "an exact replica of WebIFMIS" in FEMA's newly created "Financial Data Management Environment" (the FDME). *Id.* ¶¶ 76–77. Digital Systems raised its concerns to FEMA and went back and forth about the issue over several years. *See id.* ¶¶ 78–92, 97, 103–04. That back and forth led FEMA to investigate Digital Systems' complaints. *See id.* ¶¶ 105–12. The investigation resulted in a memorandum—the Court will refer to it as the Nixon memorandum—responding to Digital Systems' claims. *See id.* ¶ 114. In that memorandum, FEMA asserted its "disagreement with [Digital Systems'] complaints" but identified a pair of "proactive steps" it took "to address potential concerns and prevent any future misunderstandings." ECF 1-2 at 3.

After Digital Systems received the Nixon memorandum, it submitted a "certified claim" to a contracting officer at FEMA, alleging "misappropriation of" the company's confidential information. ECF 1 ¶ 121. The contracting officer issued a decision denying that claim in early 2025. *See id.* ¶ 123. Digital Systems then promptly filed a complaint in the Court of Federal Claims "seeking monetary damages for breach of contract, copyright infringement, and trade secret misappropriation under the Fifth Amendment." *Id.* ¶ 124; *see Digit. Sys. Grp., Inc. v. United States*, No. 25-cv-230 (Fed. Cl. Feb. 7, 2025).

Eight months later, the company filed its complaint in this Court. *See* ECF 1. Digital Systems alleged that FEMA's actions were contrary to law under the Administrative Procedure

Act (APA) because they ran afoul of the Trade Secrets Act. *See id.* ¶¶ 135–143. The same day that Digital Systems filed its complaint, it filed a motion for a preliminary injunction. *See* ECF 3.

The Court eventually denied that motion. *See Digit. Sys. Grp.*, 2025 WL 3876559, at *1. After "hear[ing] testimony from three witnesses over the course of a two-day evidentiary hearing," the Court made factual findings about what exactly FEMA was doing as part of its modernization effort and how it was doing it. *Id.* at *1–5, *8–11. Based on those findings, the Court concluded that Digital Systems "failed to show irreparable harm." *Id.* at *8. The Court denied the request based on "[t]hat failure alone." *Id.* Contrary to what Digital Systems claims at times in its motion for reconsideration, the Court did not find that the company had shown a likelihood of success on the merits of its claims. *Contra, e.g.*, ECF 53-1 at 11. Instead, it merely "assume[d], without deciding, that Digital Systems ha[d] demonstrated a likelihood that the Government's conduct violate[d] the law." 2025 WL 3876559, at *8.

After the Court issued its decision denying the preliminary injunction, the Government filed a motion to dismiss for failure to state a claim. *See* ECF 42. Digital Systems, for its part, filed a motion for reconsideration of the Court's ruling on the preliminary injunction. *See* ECF 53. The company later filed a motion to complete the administrative record. *See* ECF 93. The Court resolves all three of these pending motions in this order.

## II. LEGAL STANDARD

"A Rule 59(e) motion" for reconsideration "is discretionary and need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Dyson v. Dist. of Columbia*, 710 F.3d 415, 420 (D.C. Cir. 2013). "[T]he moving party has the burden of proving that relief under Rule 59(e) is warranted." *Arabaitzis v. Unum Life Ins. Co. of Am.*, 351 F. Supp. 3d 11, 14–15 (D.D.C. 2018). The underlying ruling of which Digital Systems seeks reconsideration

is the Court's denial of its request for a preliminary injunction. As with Rule 59(e), the party seeking a preliminary injunction bears the burden of proof. *See Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) ("A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.").[2]

"To survive" a Rule 12(b)(6) "motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court "must treat the complaint's factual allegations as true . . . and must grant [the] plaintiff the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000).

## III. ANALYSIS

The Court begins with the motion for reconsideration before turning to the motion to dismiss and, finally, the motion to complete the administrative record.

### A. Digital Systems has not met its burden on the motion for reconsideration.

Digital Systems says reconsideration under Rule 59(e) is "warranted for three principal reasons." ECF 53-1 at 10. First, because "newly discovered evidence shows that the Government disclosed [Digital Systems'] trade secrets to other contractors in connection with developing FEMA's new financial system." *Id.* Second, because "controlling authority holds that the unlawful disclosure of a plaintiff's trade secrets to its competitors is per se irreparable." *Id.* And third, because "the NDAs" this Court "relied upon" in denying the preliminary injunction "are not

[2] Rule 59(e) applies to a "motion to alter or amend a judgment," and Rule 54(a) explains that the word "[j]udgment as used in the[] rules includes . . . any order from which an appeal lies." Fed. R. Civ. P. 59(e); Fed. R. Civ. P. 54(a). "The denial (or grant) of a preliminary injunction is classified as an immediately appealable interlocutory order" by statute. *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009). It makes sense, then, that courts have applied Rule 59(e) when determining whether to reconsider an order granting or denying a preliminary injunction. *See N.S. v. Hughes*, No. 20-cv-101, 2020 WL 4260739, at *1 (D.D.C. July 24, 2020). Because some courts have, however, applied Rule 54(b) instead, *see id.*, the Court notes that neither party asked the Court to apply that Rule and that even if it did apply Rule 54(b) it would deny reconsideration all the same.

included in the evidentiary or administrative records proffered by the Government." *Id.* None of these proffered reasons justify reconsideration.

**1. The "new evidence" would not have changed the outcome.**

The "new evidence" that Digital Systems relies on consists of transcripts from two meetings during which FEMA employees and contractors discussed the agency's financial system modernization effort. *See* ECF 53-1 at 13 (identifying this as the "newly discovered evidence"); ECF 53-2 at 24–258 (transcripts from the two meetings). According to Digital Systems, the "transcripts confirm that the Government is misusing WebIFMIS to design, develop, deploy, distribute, and operate FEMA's new financial system, which is being developed by several DSG competitors." ECF 53-1 at 14. The Court disagrees with that characterization of the meetings.

The program manager at FEMA overseeing the agency's financial system modernization project explained that these transcripts are from two meetings that took place during the "[d]iscovery phase" of the modernization effort. ECF 62-1 ¶¶ 3–5. As that program manager previously explained during the preliminary injunction proceedings and reiterated in his declaration responding to the motion for reconsideration, during the discovery phase FEMA "assess[ed] the system requirements for [its] modernized financial and procurement system against" the new SAP software it had acquired. ECF 13-1 at 20; ECF 62-1 ¶ 5. Through that process, FEMA identified "535 reports, interfaces, configuration[s], enhancements, forms, or workflows . . . that would be required" in the new system "to meet FEMA's operational needs." ECF 13-1 at 20. But because the new SAP system had "differen[t] . . . system capabilities" from WebIFMIS and FEMA's other old systems, FEMA "embarked on extensive business process redesign" to "chang[e] how FEMA will do business in the new system." *Id.* That "effort[]" reduced those previously identified 535 needs "to just over 100." *Id.*

The meeting transcripts reveal FEMA employees and contractors engaged in one step of this work that led to FEMA's "business process redesign." ECF 13-1 at 20. In the portion of one of the calls that Digital Systems thinks is problematic, the meeting participants were reviewing a slide that shows how FEMA "take[s] data as it is stored in WebIFMIS," "restructure[s] and adjust[s] it" using a separate tool that exists "outside of" WebIFMIS—the Tier Adjustment Tool—and then reports it up to the Department of Homeland Security in the "correct format." ECF 62-1 ¶¶ 40–42. In another section of that meeting that Digital Systems points to, the group similarly discusses the need to ensure that a contractor working on the modernization project "has a good understanding of what the as is processes are." ECF 53-2 at 7. And in a third section of that meeting of concern to Digital Systems, the group talks about one particular "process flow" in which FEMA "press[es] a button in [WebIFMIS], it summarize[s] a report, [FEMA] put[s] that report into an Excel file, [FEMA] manipulate[s] that report, and [FEMA then] . . . upload[s] that to the" Department of Homeland Security's "complete financial reporting" system. *Id.* at 7; ECF 62-1 ¶ 41.

In the section of the other meeting that Digital Systems focuses on, FEMA employees and contractors discuss FEMA's "process" for purchasing things, which involves the use of Digital Systems' products and other "systems." ECF 53-2 at 9. FEMA gave the contractors an "overview" in that meeting of what each of "th[e] different systems do," answered questions about its accounting practices, talked about how both WebIFMIS and another system—a "[m]iddleware . . . software that enables . . . communication . . . between" different FEMA systems, ECF 62-1 ¶ 50 & n.3—reject transactions via various "rejection codes," and discussed other issues that arise under FEMA's current practices. ECF 53-2 at 9, 11, 13–14, 17–20.

As FEMA's program manager explains in his declaration, the participants in these meetings are discussing FEMA's own "business processes and procedures." ECF 62-1 ¶ 39. The participants discuss how FEMA uses its various systems—WebIFMIS and others—to accomplish the necessary financial tasks and manage its accounting. That this is what was going on is reflected in the outcome of this discovery process. Based on the record before the Court at this stage, it finds that FEMA did not, as Digital Systems insists, make changes to its new SAP software based on what it learned from the discovery meetings. *Contra* ECF 70 at 12. Instead, FEMA significantly streamlined the number of "reports, interfaces, configuration[s], enhancements, forms, [and] workflows" that it uses—"effectively changing how FEMA will do business"—so that it can keep the new SAP system "as close as possible to its standard, vendor-provided state." ECF 13-1 at 20–21. In other words, FEMA was studying—and later making changes to—its own "processes" and "operations" in these discovery phase meetings, not Digital Systems' "trade secrets, processes, [or] operations." 18 U.S.C. § 1905.

And even if FEMA needed to study WebIFMIS in use so FEMA could better understand its own processes—for instance, identifying points in the FEMA process where WebIFMIS generates "a report" that FEMA then "manipulate[s]," or noting that an error code "pop[s] up" in WebIFMIS if FEMA does certain things, ECF 53-2 at 7, 13—that does not prove trade secret misappropriation: It has long been settled that one who "discovers another's trade secret . . . by inspection or analysis of the commercial product embodying the secret . . . is free to disclose it or use it in his own business." Restatement (First) of Torts § 757 cmt. a (1939); *see also Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476 (1974) ("[T]rade secret law, however, does not offer protection against discovery . . . by so-called reverse engineering, that is by starting with the known product and working backward to divine the process which aided in its development or

manufacture.”). That puts to bed Digital Systems’ concern that FEMA is “reverse engineer[ing]” WebIFMIS or inappropriately identifying “pain points” that arise in its use. ECF 53-1 at 19; ECF 70 at 12. FEMA has a license to use WebIFMIS as its accounting software, and the agency is free to analyze and study its experience using WebIFMIS to identify learnings it would like to implement going forward. *See, e.g.*, Restatement (First) of Torts § 757 cmt. g, illus. 2 (explaining that trade secret laws do not prohibit a competing manufacturer from purchasing a “medicinal compound” and engaging “technicians” to “discover [its] formula” by “scientific analysis . . . and experimentation”).[3]

The handful of examples Digital Systems identifies in which it claims its confidential information was disclosed to contractors do not move the needle on irreparable harm, either. For instance, the company claims that the transcripts show FEMA is “build[ing] WebIFMIS’s trade secret business validation logic rules ‘[redacted]’ to be used post data migration.” ECF 53-2 at 6 (quoting transcript from first meeting). But what is said in the cited portion of the transcript is that the “business validation rules that are in the [Tier Adjustment Tool]” will be “[redacted].” *Id.* And that tool is not a part of WebIFMIS: it is something “FEMA accounting personnel” developed themselves in Microsoft Excel. ECF 62-1 ¶ 42. Undeterred, Digital Systems insists in reply that this tool was developed by “accessing proprietary WebIFMIS logic” and that using its rules in the new system “reflects the unauthorized replication and reimplementation of DSG’s proprietary accounting logic.” ECF 70-1 ¶¶ 18–19. But the Court credits the testimony from FEMA’s witness—who the Court already found credible on the witness

[3] The Trade Secrets Act was enacted in 1948, nine years after the publication of this Restatement. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 297 (1979). Courts “generally presume that Congress legislates against the backdrop of the common law” and nothing in the Trade Secrets Act suggests that “trade secrets” as used there was meant to deviate from that backdrop. *Comcast Corp. v. Nat’l Ass’n of Af. Am.-Owned Media*, 589 U.S. 327, 335 (2020). The Restatement is therefore instructive as to what does and does not constitute a trade secret under the Act.

stand during the preliminary injunction proceedings, *see Digit. Sys. Grp.*, 2025 WL 3876559, at *10 n.4—that the Tier Adjustment Tool is a FEMA-created tool used to "restructure and adjust" data so that it "conform[s]" to the Department of Homeland Security's standards. ECF 62-1 ¶ 42. The Court therefore finds that the "validation logic rules" being discussed in this meeting are the rules FEMA created to get its data into the required format. *See* ECF 53-2 at 6. That conclusion is backed up by the flow chart that was used in the meeting while discussing the Tier Adjustment Tool, which shows the tool being used after files are moved "outside [the] financial system." ECF 62-1 at 17.

The Court is not convinced by Digital Systems' reliance on the discussion of "rejection codes," either. ECF 70-1 ¶ 21. That dispute centers on whether a different FEMA contractor—[redacted]—has possession of "proprietary rejection codes from WebIFMIS," or instead has a list of the "error codes" used in [redacted] own software. *Compare* ECF 70-1 ¶ 22, *with* ECF 62-1 ¶ 52. The transcript from the call is ambiguous on this point. Error codes both from WebIFMIS and from [redacted] software are discussed during the call. The conversation starts with a discussion of the "reject" reasons given in [redacted] software (called "middleware" or "the interface" on the call) "*before*" a transaction "hits" WebIFMIS. ECF 53-2 at 13 (emphasis added). The conversation continues with a discussion of "the interface"—which is, again, what the meeting participants were calling [redacted] software—and its "particular coding." *Id.* Then there is a mention of "the rejection codes in" WebIFMIS. *Id.* at 14. Someone on the call then asks if others are "asking for the reject codes and definitions," and shortly thereafter someone who works with [redacted]—the company that makes the "middleware" software—chimes in to say that a "list of all the different rejection codes" can likely be gotten from [redacted]. *Id.* Given this sequence and the apparent discussion of reject codes in both company's products, it is not clear whether what is mentioned

there is a "list" of Digital Systems' "rejection codes" or [redacted] codes. Given that ambiguity and given the Court's finding that FEMA's witnesses have consistently testified honestly about the nature of the modernization program, the Court concludes that this toss-up issue alone is not nearly enough for Digital Systems to meet its "burden" on a motion for reconsideration. *See Am. Bar Ass'n v. U.S. Dep't of Educ.*, 388 F. Supp. 3d 23, 26 (D.D.C. 2019).

At bottom, then, these newly discovered emails do not change the Court's conclusion that Digital Systems has not demonstrated irreparable harm. In fact, the "new evidence" does not even suggest a strong likelihood of success in proving FEMA is violating the Trade Secrets Act. As the discussion here makes clear, the Court is not convinced that the materials discussed on these calls are Digital Systems' trade secrets. Instead, the Court finds at this preliminary stage that they are FEMA's own financial accounting practices. In discussing and reviewing those practices, FEMA may well be looking at Digital Systems' "product"—WebIFMIS—and reviewing how it uses that product, but that sort of use is allowed. *Kewanee Oil Co.*, 416 U.S. at 476. To be sure, the Court does not definitively resolve the merits of the case at this stage. Among other things, the Court has not passed on the merits related questions about what is or is not happening with Digital Systems' code inside the FDME, and these calls shed no light on those questions. All the Court decides now is that the transcripts of these two calls do not justify reconsideration of the Court's ruling on the preliminary injunction. *See Am. Bar Ass'n*, 388 F. Supp. 3d at 26 ("[A] party moving for relief under Rule 59(e) has not met its burden if the new evidence would not have changed the Court's outcome.").

**2. Digital Systems has not established that the Court made a clear error of law by failing to apply a per se irreparable harm rule.**

Digital Systems' next argument is that "controlling authority holds that the unlawful disclosure of a plaintiff's trade secrets to its competitors is per se irreparable." ECF 53-1 at 10.

The Court already rejected Digital Systems' effort to rely on this supposed "per se rule," which is ground enough for denying its attempt to "relitigate" the question via Rule 59. *Digit. Sys. Grp.*, 2025 WL 3876559, at *10; *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) ("Rule 59(e) permits a court to alter or amend a judgment, but it may not be used to relitigate old matters.").

But for good measure, the Court remains confident that it rightly rejected Digital Systems' per se rule. A preliminary injunction is an equitable remedy. *See Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318–19 (1999) (describing the relationship of the "traditional principles of equity jurisdiction" and Rule 65). "[R]igid rules and equity principles mix like oil and water." *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1234 (D.C. Cir. 2025). For that reason, "there is no rule in this circuit that *any* disclosure of information," including "the disclosure of information to competitors," "is an irreparable harm." *United States v. Google*, No. 20-cv-3715, 2026 WL 1256941, at *3 (D.D.C. May 7, 2026). Instead, courts must "account for the contours of the disclosure to assess irreparable harm[,] rather than merely rely on the fact of disclosure itself." *Id.* That is precisely what the Court did when denying the preliminary injunction.

This Court's prior decision in *Clevinger v. Advocacy Holdings, Inc.*, No. 23-cv-1159, 2023 WL 5220570 (D.D.C. Aug. 15, 2023), is not inconsistent with that approach. In that case, the Court initially denied a preliminary injunction based in part on its finding that the plaintiff had not shown irreparable harm from the defendant's "use of" the plaintiff's "proprietary information" to create a competing product. *Clevinger v. Advoc. Holdings, Inc.*, No. 23-cv-1159, 2023 WL 4560839, at *7 (D.D.C. July 15, 2023). After the plaintiff "submitted additional evidence," the Court granted its motion for reconsideration. *Clevinger*, 2023 WL 5220570, at *2. The Court found

that the plaintiff had now shown that the defendant copied the plaintiff's trade secrets—"identical design elements" and the like—directly into his competing product. *Id.*

Digital Systems understandably tries to liken this scenario to the Court's decision to reconsider its prior order in *Clevinger*. *See* ECF 53-1 at 11–13. In particular, the company latches onto the Court's statement that "the use or disclosure of proprietary information is routinely treated as per se irreparable harm." *Clevinger*, 2023 WL 5220570, at *2. But the Court did not rely on any such per se rule in *Clevinger*. The fact that the Court denied the preliminary injunction based on the lack of evidence "about what allegedly occurred *and the harm*" the plaintiff would suffer, 2023 WL 4560839, at *7 (emphasis added), before granting reconsideration based on "additional evidence" that proved the harm, 2023 WL 5220570, at *2, demonstrates that it was not a per se rule doing the work in that case; it was the particular facts and circumstances that the plaintiff had proved through the evidence. And that is confirmed by the Court's factual findings in that case. On reconsideration, the Court found that the plaintiff's trade secrets were being used in the defendant's competing product. *See Clevinger*, 2023 WL 5220570, at *2 (finding that "the information" on the competing website "is identical" to the plaintiff's trade secrets). The Court's statement about how "other courts" treat the "type of harm" at issue in *Clevinger* must be read in light of that finding. *Id.* Put differently, the "type of harm" that the Court was considering there—the one it said is "routinely treated as per se irreparable"—was the "use or disclosure of proprietary information" in a competing product. *Id.* (finding that defendant "launched a website and user interface that included identical design elements" to those developed by plaintiff for its own website). The outcome in this case is different because the Court found that the facts are different

here: that none of "Digital Systems' trade secrets are being used . . . to create a competing product." *Digit. Sys. Grp.*, 2025 WL 3876559, at *11.[4]

**3. The Court did not clearly err in finding that all of the contractors working in the FDME had signed non-disclosure agreements.**

Of course, showing that its trade secrets were being used in a competing product was not the only way that Digital Systems could demonstrate irreparable harm. The Court recognized that the disclosure of the company's trade secrets could amount to irreparable harm if those secrets were being made "public" or revealed to individuals "with no obligation to keep [them] confidential." *Digit. Sys. Grp.*, 2025 WL 3876559, at *10. The Court made a factual finding, however, that this type of disclosure was not taking place. Instead, it found that the contractors with access to Digital Systems' putative trade secrets are "obligated to keep Digital Systems' information confidential . . . because they all signed non-disclosure agreements." *Id.* Digital Systems argues that factual finding was clearly erroneous because "the NDAs relied upon in the" decision "are not included in the evidentiary or administrative records proffered by the Government." ECF 53-1 at 10. Those arguments are misplaced.

One of FEMA's witnesses testified in his declaration that "[a]ll . . . contractors with access" to the FDME "have signed" NDAs. ECF 13 at 43.[5] That witness said the same thing on

[4] Digital Systems fights this factual finding in its motion for reconsideration, insisting that because "data migration is a necessary prerequisite to creating a new computer system," the data cleansing work happening in the FDME is the "develop[ment of] a competing product." ECF 53-1 at 33–34. That argument fails to grapple with the facts as the Court found them. The Court acknowledged that the data cleansing work is a necessary part of the transition and relied on Digital Systems' CEO's testimony about the ways that process could be done. *See Digit. Sys. Grp.*, 2025 WL 3876559, at *9 (CEO describing two options). As the Court's finding based on that testimony makes clear, Digital Systems has at most shown that FEMA is "transitioning more quickly to the new software by way of its misuse of Digital Systems' trade secrets," *id.*, not using the trade secrets "to develop a competing product," ECF 53-1 at 34.

[5] In its motion for reconsideration, Digital Systems wrongly claims that "this citation"—as used in the Court's memorandum opinion on the preliminary injunction—"appears to be incorrect" because "ECF 13 . . . consists of only 30 pages." ECF 53-1 at 27 n.13. As the Court explained in its memorandum opinion, however, "[a]ll pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the *top* of each page." *Digit. Sys. Grp.*, 2025 WL 3876559, at *1 n.1 (emphasis added). This document, ECF 13, has 48

the stand during the evidentiary hearing. *See* 11/19 Hr'g Tr. 192:7–14. Same goes for FEMA's other witness. He averred in his declaration that "[a]ll contractors who have access to [the] FDME are under obligations to keep any information learned confidential via . . . non-disclosure agreement[s]," ECF 13-1 at 37, and stood by that testimony in the courtroom, *see* 11/19 Hr'g Tr. 39:10–40:24. The Court credited those witnesses' testimony—their credibility was bolstered on the witness stand when the Court saw their demeanor and how they responded to cross examination—and based on these two witnesses the Court found that the contractors had signed nondisclosure agreements. The Court is aware of no rule of evidence or procedure, and Digital Systems has cited no such rule, barring the Court from relying on that testimony without having before it the underlying agreements. *Cf. Jinks-Umstead v. England*, No. 99-cv-2691, 2005 WL 3312947, at *5 (D.D.C. Dec. 7, 2005) ("[N]o evidentiary rule prohibits a witness from testifying to a fact simply because the fact can be supported by written documentation."). And the Court finds Digital Systems' argument on this score particularly unpersuasive in the context of preliminary injunction proceedings, where decisions can be made "on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

The rules of administrative law do not support Digital Systems' argument, either. The Court considered the nondisclosure agreements in addressing irreparable harm, not the merits of Digital Systems' claim that FEMA's actions were contrary to law. Because the "issue of injunctive relief is generally not raised in the administrative proceedings[,] . . . there usually will be no

pages as reflected in the blue, automatically generated page numbers at the top of the document, and the Court correctly cited page 43 of the document where, in paragraph 23, the declarant addressed the nondisclosure agreements. Digital Systems is right that FEMA put forward additional evidence of the nondisclosure agreements in another declaration that was filed at ECF 13-1. *See* ECF 53-1 at 27 (Digital Systems identifying additional evidence the Court relied on in finding that all contractors signed nondisclosure agreements).

administrative record developed on" irreparable harm. *Eco Tour Adventures, Inc. v. Zinke*, 249 F. Supp. 3d 360, 369 n.7 (D.D.C. 2017). For that reason, it is "often . . . necessary for a court to take new evidence to fully evaluate claims of irreparable harm." *Id.* It is therefore beside the point for purposes of the irreparable harm analysis that the nondisclosure agreements were not in the initially produced certified administrative record.[6] So Digital Systems has not shown that the Court clearly erred in crediting the Government witnesses' repeated and consistent testimony that all contractors with access to the FDME signed nondisclosure agreements. Because neither that argument nor any other argument that Digital Systems put forward justifies reconsideration, the company's request for that relief is denied.

### B. The complaint plausibly alleges that Digital Systems has no other adequate remedy and that there was final agency action.

The Court turns now to the Government's motion to dismiss under Rule 12(b)(6). The Government makes only two arguments in that motion. First, it says that Digital Systems has "an adequate remedy in the Court of Federal Claims" so cannot prevail on its APA claim in this Court. ECF 42-1 at 5. Second, that the APA claim fails because Digital Systems is not challenging "a final agency action." *Id.* Neither of those arguments is right, so the Court denies the motion to dismiss.

---

[6] There was another skirmish about the NDAs when Digital Systems moved for an order to show cause, claiming that the Government's "representations" related to the NDAs were "false." ECF 84 at 1. That motion was premised on the Government's partial disclosure of some of the NDAs, but not all of them, in another of its filings in this Court. *See id.* In its response, the Government explained that in that filing it was only addressing Digital Systems' contentions related to some of the contractors and was not purporting to produce every NDA. *See* ECF 87-2 at 8–9. The Government also put forward additional evidence that the contractors signed NDAs. *See id.* at 9–10. As is evident from this opinion and the Court's order denying Digital Systems' motion for an order to show cause, the Court was satisfied with the Government's response and unconvinced by Digital Systems' arguments. *See* July 1, 2026 Sealed Min. Order.

**1. Digital Systems has "no other adequate remedy" for its claim.**

Section 704 of the APA provides "judicial review" of "final agency action[s] for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The Government insists that because Digital Systems can seek in the Court of Federal Claims—and indeed is seeking—monetary damages arising out "of the same factual allegations and alleged harms" at issue in this case, ECF 42-1 at 5, its claim in this Court cannot get past the "adequate remedy bar of § 704," *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017). "Unlike the district courts, however, the [Court of Federal Claims] has no general power to provide equitable relief against the Government or its officers." *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 313 (2011); *see also Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 608 (D.C. Cir. 1992) (noting that the "Tucker Act, which waives sovereign immunity and provides for Claims Court jurisdiction over certain claims, . . . has long been construed as waiving sovereign immunity only for claims seeking damages, and not for those seeking equitable relief"), *abrogated on other grounds as recognized by Perry Cap.*, 864 F.3d at 620.

That limit on the Claims Court's remedial powers explains why the "adequate remedy bar" does not defeat Digital Systems' APA claim. *Perry Cap.*, 864 F.3d at 621. In its complaint, Digital Systems asks the Court for declaratory relief and an injunction that remedies what it sees as FEMA's ongoing misappropriation of its trade secrets. *See* ECF 1 at 33–34. Those trade secrets are "allegedly . . . of enormous commercial value to" Digital Systems. *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 970 (D.C. Cir. 1982). The company alleges—in resolving the motion to dismiss the Court accepts these allegations as true—that "WebIFMIS is" its "most valuable asset" and that, if "disclosed," "third parties [can] produce similar systems and dilute WebIFMIS's novelty and market share." ECF 1 ¶ 148. Because it believes FEMA is in fact disclosing WebIFMIS, the company is seeking a forward-looking remedy that will prevent such dilution. And as the Court

explained in its opinion denying the preliminary injunction, Digital Systems' claim "is not one that should be classified from the outset as a contract action for Tucker Act purposes, [so] its remedies are also not contract-related." *Megapulse*, 672 F.2d at 971; *see Digit. Sys. Grp.*, 2026 WL 3876559, at *6–7. Instead, the company is seeking "injunctive relief" of the kind that the Court of Federal Claims cannot grant. *Megapulse*, 672 F.2d at 971. Digital Systems therefore has no "other adequate remedy in a court." 5 U.S.C. § 704.

**2. Digital Systems has plausibly alleged "final agency action."**

The Government also says the complaint fails to state a claim because of another of "the APA's reviewability provisions": "the finality requirement." *Perry Cap.*, 864 F.3d at 621; *see* ECF 42-1 at 15–17. Unless the "agency action" is otherwise "made reviewable by statute," only "final agency action[s]" are "subject to judicial review" under the APA. 5 U.S.C. § 704. "[P]reliminary, procedural, or intermediate agency action[s]," on the other hand, are only "subject to review on the review of the final agency action." *Id.*

"For purposes of the APA, agency action is final when it marks the consummation of the agency's decisionmaking process and is an action by which rights or obligations have been determined, or from which legal consequences will flow." *Hill v. U.S. Dep't of Interior*, 151 F.4th 420, 428 (D.C. Cir. 2025). In its complaint, Digital Systems identifies as the relevant "final agency action" "FEMA's decision to act in violation of the" Trade Secrets Act—i.e., its decision to, as Digital Systems sees it, unlawfully disclose the company's trade secrets in the FDME. ECF 1 ¶ 146. The complaint says that decision is "demonstrated . . . most definitively" by the Nixon memorandum. *Id.* Digital Systems frames things slightly differently in its opposition to the motion to dismiss. There, the company treats the Nixon memorandum itself as the "final agency action." ECF 52 at 17. The Government, for its part, argued in its motion that the Nixon memorandum was not final agency action because it did "not mark the consummation of FEMA's decision-making

process," and that even if it did at one point constitute a final agency action, Digital Systems "[r]emoved" its finality by asking FEMA "for administrative reconsideration" of the memorandum's conclusions. ECF 42-1 at 15; ECF 50 at 13.

Digital Systems' framing in its complaint of the relevant final agency action—describing it there as "FEMA's decision to act in violation of the" Trade Secrets Act, as "demonstrated" by the Nixon memorandum—aligns better with how the D.C. Circuit has approached the final agency action question in similar cases. In *Venetian Casino Resort, LLC v. EEOC*, the Circuit identified the final agency action as the "[a]dopti[on] [of] a policy of permitting employees to disclose confidential information without notice." 530 F.3d 925, 931 (D.C. Cir. 2008). The agency's argument that a "Compliance Manual" that addressed that policy was not final agency action because it was "merely a guidance document," the Circuit reasoned, was therefore "misdirected": That "Manual [was] relevant insofar as it illuminate[d] the nature of the policy, but the agency took final action by adopting the policy, not by including it in the manual." *Id.* Other similar cases are of a piece. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 318 (1979) (describing an agency's "decision to disclose" alleged trade secrets as "reviewable agency action" under the APA).

The reasoning in *Venetian Casino* fits nicely here. The complaint alleges that FEMA decided to "stand[] up an 'environment' for testing financial data"—the FDME—and "use[d] . . . WebIFMIS and its component parts" to do so. ECF 1 ¶ 70. As part of that decision, the complaint also alleges, FEMA "shared" Digital Systems' alleged secrets "with various contractors" and used those trade secrets "to construct a new system without" Digital Systems' "authorization, consent, or licensing." *Id.* ¶ 75. The Nixon memorandum, like the "Compliance Manual" in *Venetian Casino*, "illuminates the nature" of FEMA's decision. 530 F.3d at 931. It confirms that FEMA "established" the "FDME" as "a data staging environment to prepare FEMA

for eventual data migration," indicates that FEMA found "two . . . database objects that may be perceived as [Digital Systems] IP component[s]" in the FDME, and conveyed FEMA's view that what it was doing in the FDME was not an "unauthorized use or replication" of Digital Systems' "proprietary software or systems." ECF 1-2 at 2–3. In other words, the Nixon memorandum is "relevant," *Venetian Casino*, 530 F.3d at 931, because it shows FEMA did decide to set up the FDME and use it for data migration. In the complaint, Digital Systems challenges that "decision" as contrary to law because, on its view, it was contrary to the Trade Secrets Act. ECF 1 ¶ 146. Whether Digital Systems is right about that is, of course, the ultimate question to be decided in this case. But *Venetian Casino* makes clear that the alleged decision "to disclose [Digital Systems'] confidential information . . . is surely a consummation of the agency's decisionmaking process, and one by which [Digital Systems'] rights and the agency's obligations have been determined." 530 F.3d at 931.

The potential wrinkle here is that, in its opposition to the motion to dismiss, Digital Systems seems to treat the Nixon memorandum itself as the final agency action, rather than an agency statement that "demonstrate[s]" the underlying "decision." *Compare* ECF 1 ¶ 146, *with* ECF 52 at 20 ("DSG's TSA claim challenges the Nixon Memo's decision to authorize disclosure."). The Court is mindful of "party presentation" principles and its role as the "neutral arbiter of matters the parties present." *Clark v. Sweeney*, 607 U.S. 7, 9 (2025). But Digital Systems has done enough to "frame the" final agency action question for decision in the way the Court just outlined. *Id.* In its brief, the company says "the reviewable action . . . is the agency's decision to disclose," describes the Nixon memorandum as FEMA's "decision justifying disclosure" of Digital Systems' trade secrets—not the actual decision to disclose—and relies on *Venetian Casino*. ECF 52 at 18, 20–21. And most important, the company's complaint alleges all the necessary facts to infer that

the agency decided to disclose Digital Systems' trade secrets, and therefore plausibly alleges a final agency action that is subject to this Court's review. *See* ECF 1 ¶¶ 69–70, 77, 105–13, 146; *Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 387 (D.C. Cir. 2018) (asking whether "complaint . . . made clear what policy and practice" the plaintiff "challenged").

**C. The motion to complete the administrative record is denied.**

Finally, the Court quickly dispenses with Digital Systems' motion to complete the administrative record. *See* ECF 93. Digital Systems asked the Court to order completion of the administrative record only "if the administrative record" was going to be "used to adjudicate the Government's" motion to dismiss. ECF 79-3 at 5; *see also* ECF 59 at 2 (Digital Systems asking Court to waive Local Civil Rule 7(n) because the "administrative record" was "not necessary to evaluate the motion" to dismiss). As evidenced by this opinion, the Court did not "need" to "consider the administrative record in evaluating the motion[]" to dismiss, ECF 59 at 2, so Digital Systems' conditional request for completion of the administrative record is denied.

* * *

The motions for reconsideration, ECF 53, to dismiss, ECF 42, and to complete the administrative record, ECF 93, are all **DENIED**. A separate order accompanies this memorandum opinion.

JIA M. COBB
United States District Judge

Date: September 3, 2026